**BRIARCLIFF CANDY CORPORATION,**
(formerly Loft Candy Corporation),
Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 465, Docket 72-1755.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13. 1972.

Decided March 12, 1973.

John J. Yurow, Washington, D. C. (John Harllee, Jr., and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., on the brief), for appellant.

William S. Estabrook, III, Tax Division, Department of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, and Ernest J. Brown, Tax Division, Department of Justice, Washington, D. C., on the brief), for appellee.

Before KAUFMAN, ANDERSON and OAKES, Circuit Judges.

ANDERSON, Circuit Judge:

This is an appeal by Briarcliff Candy Corp. (taxpayer), formerly Loft Candy Corp. (Loft), from a decision of the Tax

Court which held that substantial expenditures made by Loft in the tax year July 1, 1961 to June 30, 1962, in developing a market for the sale of its candy to wholesale customers were made to acquire a capital asset, 26 U.S.C. § 263(a)(2), and not deductible as ordinary and necessary business expenses under 26 U.S.C. § 162(a).

The Loft Candy Corp. and its predecessors had, since late in the 19th century, engaged in the manufacture and sale of candy and confectionery products. More than 80% of its sales were made through its own retail stores, and the rest were through wholesale customers. Its retail stores were located in the thickly populated urban centers in the northeastern part of the country.

During the 1950's there began in this country, particularly in the northeast, a major demographic phenomenon in the form of a population shift of thousands of people from the urban centers to the suburbs. This gave and has continued to give rise to very serious problems for municipal, state and the federal governments, many of which still remain unresolved. The social and economic consequences have been far reaching; and urban centered businesses, large and small, have been compelled to take measures to meet the change, in the interest of survival.

In response to the effect of this exodus, the taxpayer at first sought to retain the numbers of its customers by opening retail candy stores in the suburbs but each such outlet could only attract a fraction of the sales volume achieved by the stores in the urban centers, which resulted in proportionately higher operating cost and a lower profit margin. Its operating profits for the fiscal years ending June 30, or thereabouts, of 1958 through 1961 were as follows:

| Year Ended | Operating profit before Federal Income Tax |
|---|---|
| June 28, 1958 | $886,614 |
| June 27, 1959 | 623,722 |
| July 2, 1960 | 612,388 |
| July 1, 1961 | 257,390 |

In the latter part of 1961 taxpayer's management instituted a program of soliciting independently operated retail outlets such as drugstores, card stores and the like, to include in their businesses the retail sale of Loft's candies. Taxpayer, in its own organization, set up a separate "franchise" division headed by a vice president and staffed with a sales manager, several salesmen and clerical personnel. Its task was to persuade these storekeepers to take on the retail sale of Loft's candies, to enter into agency or franchise contracts with them, specifying the terms under which candy would be furnished at wholesale by taxpayer and handled and sold by the retailer, and to see that the contracting stores were properly serviced and had a proper flow of merchandise. In each of these contracts the retail store proprietor agreed to set aside a space in the store for refrigerating display and storage counters at his own expense, to be exclusively devoted to the sale of Loft candies, and to use his best efforts to sell these candies to his customers. Taxpayer agreed to supply the retailer with its candies at a discount from retail prices and to assist the proprietor in setting up and operating the facility. It also agreed not to enfranchise a competing drugstore within a specified area. The contracts remained in operation for terms varying from one to five years and after the initial term, it was to continue from year to year unless terminated by one party giving 30 days notice to the other.

Beginning in the latter part of 1961, the franchise division of the taxpayer embarked upon an extensive advertising campaign. It advertised in drugstore trade journals and circularized proprietors by mail to interest them in becoming a retail outlet for taxpayer's products. In the tax year ending June 30, 1962, it mailed circulars, with attached reply cards to 50,000 independent drugstores. The 2,000 response cards received were followed up by telephone calls and personal visits by salesmen. By June 30, 1962, 600 appointments

were arranged and 159 contracts were entered into.

The net expenses incurred by the taxpayer in operating the franchise division for the taxable year ending June 30, 1962 were $332,869. The Commissioner divided the items making up this total into two categories of expenses which he labeled, "Promotional Expenses" and "Recurring Operational Expenses." [1] The promotional expenses aggregated $212,028, and these he disallowed as part of taxpayer's claimed net operating loss carry back from the taxable year ended June 30, 1962 to the taxable year ended June 27, 1959. The Commissioner's action was upheld by the Tax Court and the taxpayer has appealed. We reverse.

On May 3, 1971 the taxpayer sold its business to Barricini Stores Inc. The history of taxpayer's franchise division between year ending June 30, 1962 and

1. Expenses of Loft's franchise division for fiscal year 1962:

| | Total Expenses | Promotional Expenses | Recurring Operational Expenses |
|---|---|---|---|
| **Salaries:** | | | |
| Salaries of Salesmen, opening personnel, supervisors, etc. | $ 52,558 | $ 52,558 | |
| S. Kostick | 20,000 | 20,000 | |
| J. Joyce | 12,500 | 12,500 | |
| Three clerks | 9,500 | | $ 9,500 |
| One secretary— | | | |
| S. Kostick Secretary | 5,000 | | 5,000 |
| Shipping Department | 6,000 | | 6,000 |
| Maintenance | 4,000 | | 4,000 |
| Hack (½) | 5,500 | | 5,500 |
| Compensation insurance | 4,298 | 4,298 | |
| Supplies | 5,206 | | 5,206 |
| Miscellaneous | 5,177 | | 5,177 |
| Repairs | 454 | | 454 |
| Telephone | 3,957 | 3,000 | 957 |
| Postage | 2,451 | 1,500 | 951 |
| Advertising | 11,235 | 11,235 | |
| Freight and express | 9,715 | | 9,715 |
| Damaged goods | 166 | | 166 |
| Traveling | 32,116 | 32,116 | |
| Commissions | 8,104 | | 8,104 |
| Printing and stationery | 5,024 | 3,000 | 2,024 |
| Do-A-Friend Bonus | 800 | | 800 |
| Empty boxes | 1,056 | . | 1,056 |
| Travel and entertainment | 5,765 | 3,265 | 2,500 |
| Bad debts | 7,250 | | 7,250 |
| Art work | 3,605 | 3,605 | |
| Circulars | 978 | 978 | |
| Price Tickets | 2,447 | | 2,447 |
| Box wrap and designing | 582 | | 582 |
| Display | 18,917 | | 18,917 |
| Promotional | 69,637 | 69,637 | |
| Outside service | 2,060 | | 2,060 |
| S. Kostick—travel | 10,941 | 10,941 | |
| Consultant fees | 2,000 | 2,000 | |
| Insurance | 1,000 | | 1,000 |
| Dun & Bradstreet | 1,475 | | 1,475 |
| Storage | 20,000 | | 20,000 |
| **Total Expenses** | $351,474 | $230,633 | $120,841 |
| Less expenses charged to retailers | (18,605) | (18,605) | —— |
| **Net Expenses** | $332,869 | $212,028 | $120,841 |

the date of the sale of the business is significant and of interest. The following shows the agencies opened and closed during each year through June 1968, and the number in operation at the end of each year through June, 1969:

| Taxable year | Agencies opened | Agencies closed | Agencies operating at close of tax year |
|---|---|---|---|
| June 30, 1962 | 159 | — | 159 |
| June 29, 1963 | 339 | 8 | 490 |
| June 27, 1964 | 392 | 36 | 846 |
| June 26, 1965 | 415 | 75 | 1,186 |
| July 2, 1966 | 268 | 74 | 1,380 |
| July 1, 1967 | 112 | 132 | 1,360 |
| June 27, 1968 | 195 | 90 | 1,465 |
| June 28, 1969 | | | 1,640 |

Of the original 159 agencies in operation on June 30, 1962 about 120 were continuing to sell Loft's candies on June 28, 1969. The taxpayer's management, however, decided by January 1, 1969 that the returns from the franchise division were not sufficient to compensate for the administrative problems and particularly the restrictions (such as territorial restrictions) with which it was burdened under the agency contracts, and it therefore determined to terminate the agency contracts as soon as it could under their terms. The entire expenditures for and efforts of the franchise division made very little change in net sales. In the fiscal years 1958 through 1970 the net sales were as follows:

NET SALES [2]

| Fiscal year | Franchise Division | Other | Total |
|---|---|---|---|
| 1958 | | $17,334,310 (unaudited) | $17,334,310 |
| 1959 | | 17,690,409 | 17,690,409 |
| 1960 | | 18,380,263 | 18,380,263 |
| 1961 | | 17,601,868 | 17,601,868 |
| 1962 | $ 400,729 | 17,061,929 | 17,462,658 |
| 1963 | 1,645,462 | 16,128,649 | 17,774,111 |
| 1964 | 2,692,244 | 15,143,061 | 17,835,305 |
| 1965 | 3,516,812 | 14,459,572 | 17,976,384 |
| 1966 | 3,855,340 | 14,503,729 | 18,359,069 |
| 1967 | 3,507,244 | 14,824,558 | 18,331,802 |
| 1968 | 3,432,995 | 14,009,960 | 17,442,955 |
| 1969 | 2,901,799 | 13,284,191 | 16,185,990 |
| 1970 | 3,301,616 | 15,257,689 | 18,559,305 |

As of the fiscal year ending June 28, 1969, Loft's divisional sources of sales were as follows: 66% came from 250 company operated retail candy shops; 18% from 1,640 agency stores; 8% from 160 department stores and candy shops; and 8% from other outlets.

When the taxpayer sold its business to Barricini Stores Inc. it was paid $10,000 for a group of assets made up of trademarks and tradenames, usable inventories, customer lists, agency contracts, manufacturing formulae, standards, guidelines and other production know-how, and a portion of its plant equipment and machinery.

2. When the impact of inflation is removed from these figures, the decline of Loft's non-franchise sales is even more clearly demonstrated:

NET SALES

[Constant (1958) Dollars]

| Fiscal year | Franchise Division | Other | Total |
|---|---|---|---|
| 1958 | | $17,334,310 | $17,334,310 |
| 1959 | | 17,394,699 | 17,394,699 |
| 1960 | | 17,793,091 | 17,793,091 |
| 1961 | | 16,827,790 | 16,827,790 |
| 1962 | $ 379,119 | 16,141,844 | 16,520,963 |
| 1963 | 1,536,379 | 15,059,430 | 16,595,809 |
| 1964 | 2,474,489 | 13,918,255 | 16,392,744 |
| 1965 | 3,171,156 | 13,038,388 | 16,209,544 |
| 1966 | 3,384,846 | 12,733,739 | 16,118,586 |
| 1967 | 2,982,350 | 12,605,917 | 15,588,267 |
| 1968 | 2,807,028 | 11,455,405 | 14,262,433 |
| 1969 | 2,265,261 | 10,370,173 | 12,635,433 |
| 1970 | 2,447,454 | 11,310,370 | 13,757,824 |

The Commissioner concluded that the taxpayer's expenditures of $212,028 in 1962 were for capital assets "consisting of 159 valuable franchise contracts." But in 1971, in the sale of the business, 179 of some of the same and similar franchise or agency contracts brought only a fraction of $10,000. The $212,028 were only those described by the Commissioner as promotional expenses. The total expenses of the franchise division for 1962 amounted to $332,869. Nor was that the end of this kind of outlay. In subsequent full years through June 30, 1970, it was necessary to pay out an average in excess of twice what was spent in the half year ending June 30, 1962, in order to hold onto most of the contracting storekeepers and add new ones. The yearly totals were as follows:

| 1962 | $332,869 |
|------|----------|
| 1963 | 580,702 |
| 1964 | 603,817 |
| 1965 | 808,965 |
| 1966 | 740,689 |
| 1967 | 687,224 |
| 1968 | 730,852 |
| 1969 | 727,483 |
| 1970 | 635,013 |
| Total | $5,847,614 |

Taxpayer's management considered that these expenses were annually recurrent and did not result in the acquisition of permanent capital assets. In spite of these large expenditures the net sales, as noted above, remained about the same while the net income declined.[3]

The Commissioner regarded taxpayer's effort to maintain its sales and profits by seeking to recapture its customers who had moved to the suburbs as creating, in the franchise division, a distribution system for its products involving the securing of valuable agency contracts with druggists and other storekeepers which were capital assets, and that therefore the expenditures made in acquiring them were not deductible as "ordinary and necessary expenses paid or incurred in the taxable year in carrying on any trade or business."

The case principally relied upon by the Commissioner and the Tax Court is Houston Natural Gas Corp. v. Commissioner, 90 F.2d 814 (4 Cir.), cert. denied, 302 U.S. 722, 58 S.Ct. 43, 82 L.Ed. 557 (1937). Prior to 1927, Houston Gas & Fuel had a monopoly on the gas business in Houston. The taxpayer, Houston Natural Gas was engaged in the sale of gas in areas other than the City of Houston. Upon receiving permits for the construction of gas lines in Houston, Houston Natural Gas sold all its properties, except those in the suburbs of Houston and in Pasadena. Houston Natural Gas and Houston Gas & Fuel then began a prolonged and viciously fought battle for the gas business of Houston. One of Houston Natural Gas' methods was the employment of armies of solicitors charged with the duty of keeping established customers happy

3. Loft Candy Corporation net income:*

| Fiscal year | Franchise Division | Other | Total |
|-------------|--------------------|-------|-------|
| 1958 | $ | $ 886,614 | $886,614 |
| 1959 | | 623,722 | 623,722 |
| 1960 | | 612,388 | 612,388 |
| 1961 | | 257,390 | 257,390 |
| 1962 | not available | not available | 51,031 |
| 1963 | (184,170) | (602,489) | (786,659) |
| 1964 | 33,468 | ( 63,847) | ( 30,379) |
| 1965 | 42,996 | (309,308) | (266,312) |
| 1966 | 197,081 | ( 78,471) | 118,610 |
| 1967 | 143,519 | (368,614) | (225,095) |
| 1968 | 65,200 | (954,486) | (889,286) |
| 1969 | (146,814) | (3,389,583) | (3,536,397) |
| 1970 | ( 1,304) | (3,670,101) | (3,671,405) |

* Before Taxes and Extraordinary Items.

while securing new ones. It also offered free installation of service lines between consumers' residences and the company's distribution system. The issue was the deductibility of the salaries and expenses of the solicitors, and the expenses incurred in installing the service lines.

The Court of Appeals affirmed the Commissioner's and the Tax Court's rulings that these had been capital expenditures because they constituted "[t]he acquirement of something of permanent use or value in the business," 90 F.2d at 816, quoting Gauley Mountain Coal Co. v. Commissioner, 23 F.2d 574, 576 (4 Cir. 1928), which consisted of (1) new customers, (2) good will, and (3) elimination of competition. The *Houston Natural Gas* case is cited by the Commissioner as an example of the application of a long standing principle of the Tax Court that ". . . expenditures made for benefits which are to be enjoyed for a period extending beyond the year in which they are made should be capitalized." The Commissioner recited this as the general rule governing the decision in the present case. He further asserts that this rule will transmute expenses which would otherwise be "ordinary" under § 162 and therefore deductible, into non-deductible capital expenditures. The Commissioner also cites the *Houston Natural Gas* case as establishing the proposition that ". . . an intensive campaign to get new customers at any time gives rise to capital expenditures," which he asserts also applies to the present case.

 The Government's brief mentioned Mountain Paper Products Corp. v. United States, 287 F.2d 957 (2 Cir. 1961), as a decision which supports its concept of what a capital asset is. But that case concerned the acquisition of an entire business. There can be little doubt that Houston Natural Gas acquired a capital asset when it drove Houston Gas & Fuel Co. into receivership and took over the monopoly of the gas business in Houston. It is also well settled that where one company acquires another separate and distinct business

entity, the cost of taking it over is a capital expenditure and not deductible under § 162. Similarly there is a capital expenditure where the taxpayer adds to its regular business of making and selling a product, a new branch or division designed to make and sell a different product. Of course, the tangible assets, such as buildings and equipment, newly put into such branch or addition, regardless of product, are capital additions. Also, a reasonable proportion of the wages and salaries of employees who spend some of their working hours laboring on the acquisition of the company's new division, are allocable under Internal Revenue regulations to the new division, and therefore are chargeable to capital and not deductible. *See* 26 C.F. R. § 1.266-1(e).

Where however, the contributing factor is intangible and it enhances an intangible capital asset of the new division of the same established company, the boundary line between a taxable capital asset and a deductible ordinary and necessary expense, incurred in carrying on a business, becomes imprecise.

 In the present case the taxpayer used its sales personnel to solicit storekeepers, mainly druggists, as retail sellers of Loft candy. Though the sales group was called the "Franchise Division," it was a part of the sales department of the company. The product sold was the same, it was also sold and for many years had been sold through the company-owned or leased retail outlets and through department stores and other business establishments. Loft was by long established policy both a wholesaler and retailer. It suffered a continuing loss of business when there was an exodus of many city dwellers to the suburbs; and it sought, through sales in the suburbs, to stem the flow of losses.

 The Commissioner relies on what he describes as "valuable franchise contracts with druggists" which provided the taxpayer with a certain suburban market for the duration of the contracts. The lack of substance in this

concept will be discussed later on. Every new idea and every change of method in making sales, even in promoting special sales or developing new sales territory, do not require that the expenses connected with the operation be non-deductible under § 162. While the quotation taken by the Commissioner from *Houston Natural Gas* that "an intensive campaign to get new customers at any time gives rise to capital expenditures" may be valid enough if confined to the facts of that case, it is not acceptable as an unqualified general rule. In fact, expenditures by an already established and going concern in developing a new sales territory are deductible under § 162. Rev.Rul. 56–181.

In reviewing the action of the Tax Court we have in mind that we said several years ago that "[t]he line between capital and current expenses is often a difficult one to draw, and Courts of Appeals should not overturn decisions of the Tax Court on this question unless they are manifestly wrong." Seas Shipping Co. v. Commissioner, 371 F.2d 528 (2 Cir.), cert. denied, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967). We are of the opinion, however, that manifest error was committed in this case. The Tax Court rests its decision squarely on the fact that some of the agency agreements continued in effect for terms exceeding a year, and that therefore the expenses connected with the procuring of the agreements were not "ordinary" but capital in nature and could not be deducted under § 162.

Prior to 1971 this was an often repeated and generally applied standard. The Supreme Court, however, in the case of Commissioner v. Lincoln Savings & Loan Ass'n, 403 U.S. 345, 354, 91 S. Ct. 1893, 1899, 29 L.Ed.2d 519 (1971), held,

". . . [T]he presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year.

What is important and controlling, we feel, is that the [premium] payment serves to create or enhance for [the taxpayer] what is essentially a separate and distinct additional asset . . ."

This has brought about a radical shift in emphasis and directs the inquiry in the present case to the question whether or not Loft, in advertising and soliciting drugstores and others to act as agents for the sale of its candies, and in making written agreements with them to function in that capacity, "created or enhanced for [itself] what [was] essentially a separate and distinct additional asset." The Commissioner claims it did because the expenditures made, the deductibility of which is now at issue, resulted in the creation of "valuable franchise contracts which assured Loft of a certain suburban market for the terms of the agreements." He also, in effect, claims that the ways and means adopted by Loft to bring about this result, in themselves, point to the creation of a capital asset; these are such things as Loft's creation of a separate division to seek and procure sales outlets for its candies in the suburban area, the assertion that this was an intensive campaign to get new customers, the advertising addressed, not to ultimate consumers, but to the drugstore owners and other storekeepers, and the fact that Loft had suffered a decline in operating profits and was seeking to block the continuing erosion—a fact which, he asserts, brings the case within the prohibitions against deduction provided in § 263(a)(2).

Taking up first the foregoing ways and means which allegedly indicate the creation of a capital asset, the changes which Loft made in its own internal organization to spread its sales into a new territory were not comparable to the acquisition of a new additional branch or division to make and sell a new and different product. Loft, in spite of its own talk about an additional division and the entering into franchise contracts, was doing no more than stimulating its sales department to stem the downward

course of sales by making Loft's candy available in the suburbs to a class of customers who had moved there from the cities where they had been purchasers of its candy. It was selling exactly the same products it had sold for decades.

Loft added some personnel to its sales force and advertised extensively. The Commissioner concluded that these measures constituted "an intensive campaign to get new customers" which, *ipso facto*, according to *Houston Natural Gas*, "give rise to capital expenditures." With this we disagree. Every business entity, to remain viable, must continue to promote the sale of its product. The Tax Court, however, has enunciated as the law, a portion of Northwestern Yeast Co., 5 B.T.A. 232, 237 (1926), which says:

> "There can be little doubt in the minds of reasonable men fairly acquainted with modern business that promotion expenditures like those before us have a significance similar to the investment in more tangible assets. They fertilize the field for new production. Generally and theoretically, therefore, it is safe to say that some part of the cost of a campaign or system of promotion may be of permanent significance and may be regarded as a capital investment rather than a deductible expense."

If this is so, then it is incumbent on the legislative authorities making the statutes and the implementing regulations to furnish clear standards and guidelines as to what intangible assets are deductible under § 162 and what are not.

At present it is anybody's guess. What for example is "an intensive campaign to get new customers"? If Loft had added a half a dozen salesmen to its sales department and sent them on a house-to-house canvass in a new territory, taking orders for candy, would that be an "intensive campaign"? If not, would the addition of 100 new salesmen using *house-to-house* solicitation and a large amount of advance advertising in the new territory fulfill the term? If

this is a matter of degree, as in many instances the rulings seem to indicate, at what point does the quality or quantity of new and perhaps different sales and promotional activity cease to be deductible under § 162 and become a capital expense?

The uncertainty concerning the allocation, and consequently the deductibility, of the intangible contribution of a salesmen's wages or salary is illustrated by Revenue Rulings 68–561 and 69–331.

The first of these concerned the activities of a gas utility company in promoting the construction of "all gas" houses. Special salesmen were sent out to solicit construction companies; also cash allowances were offered to participating contractors, and these efforts were accompanied by an advertising campaign. The offering of cash allowances were held to be a capital expenditure, but the salaries of the salesmen and the cost of advertising were held to be deductible.

In the second of these rulings, 69–331, a gas utility gave bonuses and commissions to its own salesmen who were successful in soliciting consumers to lease gas-operated heaters. The same awards were given dealers and plumbing contractors for persuading consumers to lease the heaters. The bonuses and commissions were held non-deductible.

Why salaries for solicitors for "all gas" houses are deductible, but those of solicitors for gas water heaters are not, is not readily apparent.

The Commissioner attempted to shed some light on the distinction between the two rulings by explaining that "all gas" homes (and the advertising) were "less directly and significantly productive of assets having a value extending beyond the taxable year in which paid or incurred." If further elucidation were possible, it would certainly be welcome.

■ The Tax Court says:

"The expenses incurred by petitioner in its drugstore solicitation program were not advertising directed at the

promotion of its product but advertising directed at establishing new channels of distribution for that product and therefore would not be 'ordinary' within the meaning of § 162(a)."

In effect, this would permit a retailer dealing with ultimate consumers to deduct its advertising and promotional expenses in seeking and acquiring new customers, but deny similar tax treatment to a wholesaler whose customers are retailers. This is plainly a most unjust and unequal interpretation of the law, unsupported by legislative, regulatory or judicial authority. All sellers, whether at a wholesale or retail level, must be treated alike—in the absence of the acquisition of a capital asset, their expenses for advertising and promotion should be deductible under § 162.

The Tax Court in its explanation of the kind of an "outlet" which is a capital asset, which it asserts Loft acquired through the so-called "franchise agreements", said,

> "In numerous cases we have held that where a taxpayer purchases new outlets for the sale of its products, whether or not those outlets are acquired as a part of a going business, the asset acquired is a capital asset and the payment for acquiring the new outlets must be capitalized. See Manhattan Co. of Virginia, Inc., 50 T.C. 78 (1968). In the instant case petitioner acquired new outlets through its own efforts as distinguished from acquiring these assets by purchase. The fact that a capital asset is built or developed through the taxpayer's own efforts does not change the nature of the expenditures necessary to acquire the asset. See Ben Perlmutter, 44 T.C. 382 (1965), aff'd, 373 F.2d 45 (C.A. 10, 1967), in which we held a portion of overhead expenses, including officers salaries, other overhead salaries, depreciation, insurance, legal and audit expenses, office expenses, truck expenses, and costs of utilities to be allocable to the construction of shopping center buildings and required that the allocable

portion of such expenses be capitalized."

It is obvious that the court is talking about intangible contributions to *tangible* assets; not *intangible* contributions to *intangible* assets. It speaks in words such as "built or developed" and "construction of shopping center buildings". In the foregoing discussion it is fully recognized that an intangible contribution to tangible assets, such as a company's engineer's supervision of the construction of a particular section of a new factory building, makes his salary, or a proportionate part of it, a capital expenditure connected with the building of the factory. If, however, the sales manager of an ongoing concern has contributed 25% of his time to devising a new or different method of attracting customers and selling candy, i. e. an intangible asset to his company, the deductibility or non-deductibility of that 25% of his salary turns upon the question of whether or not the new method is a *capital* asset and therefore non-deductible. It is a capital asset if at the time it is furnished to the company, it has an ascertainable and measurable value—that is, a value in money or a fair market value. It is not enough that it may have a favorable expectancy or that in the course of its use it increases sales and produces income.

Reverting to the Tax Court's discussion of new outlets, it said,

> "In the instant case petitioner acquired new outlets through its own efforts as distinguished from acquiring these assets by purchase. The fact that a capital asset is built or developed through the taxpayer's own efforts does not change the nature of the expenditures necessary to acquire the asset."

The claimed distinction between outlets which are "purchased" and those which are "acquired through the taxpayer's own efforts" is practically meaningless. The phrase "acquired through the taxpayer's own efforts" is not recognized in the law as descriptive of a par-

ticular set of legal relations or interests. It certainly could embrace a purchase. Supposedly Loft could have leased, for a term of several years, floor spaces in the drugstores together with the refrigerating display cases. These facilities would have been "outlets acquired by its own efforts," but the rent under the leases would have clearly been deductible, 26 U.S.C. § 162(a)(3), and nothing about them would have been a capital asset, unless a lease was assigned to another at a profit. 4A Mertens, Law of Federal Income Taxation § 25.27 (1972).

█ The Commissioner also urges that the deductibility of the advertising and promotional expenses in this case are prohibited by § 263(a) because Loft, by undertaking "an ambitious new distribution program," was seeking to make up for its drop in sales and the subsequent decline of operating profits. This section says,

"No deduction shall be allowed for any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made."

The section is couched in terms which refer to tangible capital assets such as consumable resources or tools, structures, or machinery which wear out and for which depreciation has already been taken. It may also be applied to intangible assets provided they have an ascertainable and measurable value in money's worth, so that they are no longer regarded as an expense but as a distinct and recognized property interest. Commissioner v. Lincoln Savings & Loan Ass'n, *supra*, 403 U.S. at 354–355, 91 S. Ct. 1893.

The interpretation and application of the statutes and regulations with regard to tangibles in deciding whether a particular expenditure is for repairs or for a capital addition or improvement are sometimes difficult, but guidelines have been established which give a taxpayer clues as to what is correct and what is not.

In the realm of intangibles, however, the rulings and decisions are in a state of hopeless confusion particularly where the issue concerns an intangible contribution (such as a salesman's work-product) to an intangible asset (such as his company's position in the market). Many decisions in this area rest upon administrative fiat, fortified by the requirement that the taxpayer show clear error. The Commissioner in the present case resorted to such nebulous phrases as "an intensive campaign to get new customers" and "an ambitious new distribution program" to define what a capital asset was in the circumstances of the case. But practically all businesses are constantly seeking new customers and pursuing a distribution program. When are the wages and salaries of its employees who take care of these things capital expenditures and non-deductible and when are they current expenses and deductible under § 162? The taxpayer, who may be exposed to interest and penalties for guessing wrong, is entitled to reasonably clear criteria or standards to let him know what his rights and duties are. As matters stand, the following quotation alluded to by a court of appeals of another circuit, which was wrestling with this general area of federal income tax law, is pertinent,

"This kind can come forth by nothing, but by prayer and fasting."

The remaining point for discussion concerns the so-called "franchise agreements". According to the Commissioner, Loft, by these instruments acquired capital assets, to wit: "159 new franchise outlets, innumerable new suburban customers, and the good will attendant to such acquisition, and assurance of a suburban market for at least the duration of the initial term of the contract.

█ The Tax Court decision and the claims of the Commissioner on this appeal rest principally on the fact that the franchise or agency agreements provided benefits which Loft would enjoy for a period extending beyond the year in which they were made, and that, even if the payments made by Loft were other-

wise ordinary within the meaning of § 162, the fact that the agreements were effective for more than one year make them capital assets. The Supreme Court, however, in *Lincoln Savings & Loan, supra,* held that the factor that an ensuing benefit may have some future aspect is not controlling, as the Tax Court has made it in the present case. The Supreme Court said that what was important and controlling was that the expenditures served to create or enhance for the taxpayer what is essentially a separate and distinct additional asset.

The Tax Court and the Commissioner argue that the franchise or agency agreements were in their nature valuable capital assets. We are of the opinion, however, that a review of the evidence, including an analysis of these agreements, does not furnish support for this conclusion. As there is no special statutory definition of "capital asset" which is applicable to their use in connection with §§ 162 and 263, the words must be taken in their usual and customary business sense as items of ownership of a permanent or fixed nature which are convertible into cash. In the first place the agreements gave Loft no property interest whatever in the small space occupied by the twelve foot display case or the storage area or the advertising features, or in the case itself. Title, possession and control remained in the store owner. Loft did not even have a leasehold interest. If it had acquired the stronger and more fixed attributes of a lease, it still would not have been a capital asset and the rent it paid would have been deductible under § 162. Where an outlet is procured through a lease or an agreement, such as those made here by Loft, the value of such limited use as Loft had in the outlet does not extend beyond the consideration which Loft, as the user, had to pay for it under the agreement.[4] Loft paid by recognizing the store owner as a retailer for its candy, by giving him a commission on his retail sales, by according him the exclusive right (with a few minor exceptions) to carry on the retail sale of Loft's candies within a specified area around his store, by providing the product and by giving necessary training and advice concerning sales and advertising.

In return Loft had the store owner's promise to install at his own expense a certain type of refrigerating display case and storage area to show certain advertising material, to set aside an area of floor space for the case and advertising matter where no other candy but Loft's could be sold, and to permit Loft to inspect the area and case and to control his advertising. He was also to use his best efforts in selling Loft's products. The store owner did not agree not to sell similar candy products of other manufacturers in the remainder of the store. *He did not agree to sell any minimum amount of candy nor did he guarantee any amount of sales.*[5]

---

4. Payments made to a landlord or to the lessee of an existing lease, over and above the amounts stipulated as rent by one seeking to acquire a lease are, of course, capital expenditures. 4A Mertens, Law of Federal Income Taxation, § 25.27 (1972).

5. The meagerness of Loft's rights under these contracts made them only marginally enforceable. At most, Loft could have sought to enforce a drugstore proprietor's vague promise to use his "best efforts" in selling the candy, which might be satisfied simply by his keeping his store open during normal business hours and refraining from overtly criticizing Loft's products.

In effect, by these contracts Loft acquired little more than an expectation or hope of future sales. While the druggists' promises to dedicate certain minimum space to their Loft candy departments created a degree of mutuality which is a step beyond that which existed in the contracts considered in Willard, Sutherland & Co. v. United States, 262 U.S. 489, 43 S. Ct. 592, 67 L.Ed. 1086 (1923) and Van Iderstine Co. v. Commissioner, 261 F.2d 211 (2 Cir. 1958), we do not believe this minor additional factor is sufficient to justify our concluding that Loft purchased some intangible capital assets by these contracts. See Van Iderstine Co. v. Commissioner, *supra,* 261 F.2d at 212–213.

■ There is nothing in the substance of these contracts which is distinguishable from a contract of employment for a term of a year or years. The store proprietors simply became retail sales agents of Loft on a commission-paid basis. The expenditures at issue in the case are ordinary recruiting costs to enlist sales agents for a long established concern, and to seek sales agents for its usual and regular product. As such, they are deductible. *See* Queen City Printing Co. v. Commissioner, 6 B.T.A. 521 (1927); Hearing before Senate Finance Committee on the Deductibility of Travel and Entertainment Expenditures, 88th Cong. 1st Sess., p. 59 (1963) (Testimony of Mortimer Caplin, Commissioner of Internal Revenue).

The Commissioner claims that each of the so-called franchise or agency agreements produced capital assets of "innumerable new suburban customers, good will and assurance of a suburban market for at least the duration of the initial term of the contract." But these results are no different from what a number of good commission-paid salesmen in the same territory would have achieved and such commissions are clearly deductible under § 162. Loft did not acquire any new separate and distinct additional asset in these agreements.

For these reasons we hold that the decision of the Tax Court was manifestly wrong. We also hold that the Tax Court erred in failing to consider and apply the governing principle of law.

By late 1961 and early 1962 it was reasonably clear to the Loft Candy Corporation that the population shift had brought about continuously declining sales and a progressively shrinking net income. In order to stem the downward flow, protect its investment and continue in business, Loft was compelled to increase its sales, and it sought to do so by making its product more readily available to those who had moved to the suburbs.

■ The facts of this case bring it squarely within the long recognized principle that expenditures for the protection of an existing investment or the continuation of an existing business or the preservation of existing income from loss or diminution, are ordinary and necessary within the meaning of § 162 and not capital in nature. Allen v. Commissioner, 283 F.2d 785, 790–791 (7 Cir. 1960); Lutz v. Commissioner, 282 F.2d 614, 617, 620 (5 Cir. 1960); Van Iderstine Co. v. Commissioner, 261 F.2d 211, 213 (2 Cir. 1958); Commissioner v. Surface Combustion Corp., 181 F.2d 444, 447 (6 Cir. 1950); United States v. E. L. Bruce Co., 180 F.2d 846, 848–849 (6 Cir. 1950); Lincoln Electric Co. v. Commissioner, 162 F.2d 379, 383 (6 Cir. 1947), reconsidered on other grounds, 176 F.2d 815 (6 Cir. 1949), cert. denied, 338 U.S. 949, 70 S.Ct. 488, 94 L.Ed. 586 (1950); Dunn & McCarthy v. Commissioner, 139 F.2d 242, 244 (2 Cir. 1943); Helvering v. Community Bond & Mortgage Corp., 74 F.2d 727, 728 (2 Cir. 1935); A. Harris & Co. v. Lucas, 48 F. 2d 187, 189 (5 Cir. 1931); Snow, 31 T. C. 585, 593 (1958). *See also,* Young & Rubicam, Inc. v. United States, 410 F.2d 1233, 1243, 187 Ct.Cl. 635 (1969); Carl Reimers Co. v. Commissioner, 211 F.2d 66, 68 (2 Cir. 1954); Robertson v. Steele's Mills, 172 F.2d 817, 821 (4 Cir.), cert. denied, 338 U.S. 848, 70 S.Ct. 86, 94 L.Ed. 519 (1949).

The decision of the Tax Court insofar as it holds that the $212,028 expended by taxpayer in the tax year 1962 was not deductible is reversed and the case is remanded for modification of the judgment accordingly.