112 T.C. No. 9


UNITED STATES TAX COURT


NORWEST CORPORATION AND SUBSIDIARIES, SUCCESSOR IN INTEREST TO
DAVENPORT BANK AND TRUST COMPANY AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25613-95.                    Filed March 8, 1999.


        D and N entered into a transaction that resulted
in N's owning all the stock of an entity of which D was
a part.  P concedes that sec. 263(a), I.R.C., requires
that D capitalize the costs that were directly related
to the transaction.  P disputes R's determination that
sec. 162(a), I.R.C., does not let D deduct
investigatory and due diligence costs and all of its
officers' salaries.  The investigatory costs relate
primarily to services rendered by L, a law firm, before
D agreed to participate in the transaction.  D retained
L to investigate whether a reorganization-like
transaction with N would be good for D and its local
community, so that D's management and board could
decide whether D should agree to such a transaction.
The remaining investigatory costs relate to services
performed by L in investigating whether, after the
transaction, N's director and officer liability
coverage would protect D's directors and officers for

acts and omissions occurring before the transaction. The due diligence costs relate to services performed by L in connection with N's due diligence review. The disallowed officers' salaries were attributable to the transaction.

Held: Sec. 162(a), I.R.C., does not let D deduct any of the disputed costs.

Mark A. Hager, John R. Kalligher, William K. Wilcox, and Walter A. Pickhardt, for petitioner.

Jack Forsberg, for respondent.

LARO, Judge: Norwest Corp. (Norwest) and Subsidiaries, Successor in Interest to Davenport Bank and Trust Co. (DBTC) and Subsidiaries, petitioned the Court to redetermine respondent's determination of a $132,088 deficiency in DBTC's 1991 consolidated Federal income tax. Following petitioner's concessions, the only issue left to decide is whether section 162(a) allows DBTC to deduct investigatory costs, due diligence costs, and officers' salaries which respondent determined were attributable to an acquisition of DBTC. We hold that DBTC may not deduct any of these costs. Unless otherwise stated, section references are to the Internal Revenue Code in effect for the subject year. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

FINDINGS OF FACT[1]

1.  General Information

Norwest is a bank holding company that was incorporated in 1929.  It is the parent corporation of an affiliated group of corporations (Norwest consolidated group) that files consolidated Federal income tax returns.  Its affiliates include 79 commercial banks in 12 States and numerous other corporations which provide financial services.  Norwest's stock is traded on the New York and Midwest Stock Exchanges.

Bettendorf Bank, National Association (BBNA), is a member of the Norwest consolidated group.  BBNA is a national banking association operating under a charter granted by the Office of the Comptroller of the Currency (OCC).  BBNA conducts a general banking business from its main office in Bettendorf, Iowa, and from two branches, one in Bettendorf and the other in Davenport, Iowa.

DBTC is an Iowa State bank that was incorporated in 1932.  Before the transaction (defined below), it provided banking and related services in the four-city area that consists of Davenport, Bettendorf, Rock Island, Illinois, and Moline, Illinois (Quad Cities area).  Its main office was in Davenport,

---

[1] Most of the facts were stipulated.  The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference.  When the petition was filed, petitioner's principal place of business was in Minneapolis, Minnesota.

and it had four branches, three in Davenport and one in Donahue, Iowa. It filed a consolidated Federal income tax return with two wholly owned subsidiaries.

DBTC's only class of stock was thinly traded in the Davenport over-the-counter market. It had 1.2 million shares outstanding, and DBTC's founder (V.O. Figge) and his five children (collectively, the Figges) owned, collectively and beneficially, the following numbers and percentages of these shares:

|                    | Number  | Percentage |
|--------------------|---------|------------|
| V.O. Figge         | 41,843  | 3.5        |
| John K. Figge      | 61,140  | 5.1        |
| James K. Figge     | 63,450  | 5.3        |
| Thomas K. Figge    | 71,855  | 6.0        |
| Ann Figge Brawley  | 77,890  | 6.5        |
| Marie Figge Wise   | 69,655  | 5.8        |
|                    | 385,833 | 32.2       |

DBTC's directors and executive officers, other than the Figges, owned another 69,727 (5.8 percent) of these shares on September 18, 1991.

2. The Transaction

In 1989, Iowa adopted interstate banking legislation that allowed, for the first time, the acquisition of Iowa banks by banking institutions located in States which were contiguous with Iowa and which had enacted reciprocal legislation. DBTC's management expected that national banking would follow and that many large banks, including some from outside Iowa, would be

competing in the Quad Cities area.  DBTC's management was concerned that banks of DBTC's size (i.e., larger than the small community banks and smaller than the large regional banks) would be unable to compete in the future.

During 1990, Norwest began talking to DBTC about joining their businesses, and these discussions intensified in early 1991.[2]  DBTC retained the law firm of Lane & Waterman (L&W) to assist it in these discussions.  L&W investigated whether DBTC would strategically fit with Norwest and its affiliates, and whether a reorganization between DBTC and Norwest would be good for the community.

On June 10, 1991, DBTC's board of directors met to consider merging DBTC into Norwest.  Over V.O. Figge's objection to the merger, the board authorized John K. Figge, James K. Figge, and Thomas K. Figge, in their capacities as executive officers, to negotiate with Norwest and to hire legal and other representatives with the intent to recommend to DBTC's board a letter of intent between DBTC and Norwest on a plan of reorganization.  The board also appointed an ad hoc committee (special committee) consisting of four outside directors to perform an independent due diligence review, to obtain professional advice, and to report to DBTC's board as to the

---

[2] Except for the discussions set forth herein, DBTC never discussed joining its business with that of any other entity.

fairness and appraisal of the proposed transaction. Norwest's board of directors, on the same day, authorized using up to 10 million shares of Norwest common stock to effect a transaction with DBTC.

DBTC retained J.P. Morgan & Co., Inc., as its financial adviser for any transaction with Norwest and to render an opinion as to the fairness of the consideration that DBTC's shareholders might receive in the transaction. DBTC retained KPMG Peat Marwick to render opinions primarily on whether the proposed transaction would be a reorganization for Federal income tax purposes, and whether the proposed transaction would qualify for a desired method of accounting.

On July 22, 1991, DBTC's board met to consider a transaction (transaction) whereby DBTC and BBNA would be consolidated to form a national bank (New Davenport) which would be wholly owned by Norwest. At the meeting, the special committee recommended that the transaction be approved, and J.P. Morgan opined that the transaction was fair to DBTC's shareholders from a financial point of view. DBTC's board approved the transaction. On the same day, BBNA's board approved the transaction.

Four other events also occurred on July 22, 1991, with respect to the transaction. First, Norwest, BBNA, and DBTC entered into an agreement (agreement) whereby they agreed to the transaction subject to regulatory approval, approval of DBTC's

and BBNA's shareholders, and the satisfaction of certain conditions which included: (1) The receipt of regulatory approvals, including the approval of the OCC, without any requirement or condition that Norwest would consider unduly burdensome, and (2) the receipt of Peat Marwick's opinions that the transaction would qualify for the desired method of accounting and as a tax-free reorganization.

Second, Norwest entered into voting agreements with certain DBTC shareholders. These shareholders held 24.5 percent of DBTC's stock and included John Figge, James Figge, Thomas Figge, and other members of the Figge family. The voting agreements provided that these shareholders would vote their shares in favor of the transaction and that they would help Norwest complete the transaction.

Third, BBNA entered into employment agreements with V.O. Figge, John Figge, James Figge, Thomas Figge, and Richard R. Horst. The employment agreements provided that the five listed people would be employed as officers of New Davenport for 1 year at the same salaries they were receiving from DBTC. The parties to the transaction contemplated that John Figge, James Figge, and Thomas Figge would become senior vice presidents of New Davenport and that the members of DBTC's board would become members of New Davenport's board. Norwest agreed to cause John Figge to be elected to its board.

Fourth, Norwest issued a press release announcing that it had agreed with DBTC to acquire DBTC. The release, quoting V.O. Figge, stated in part:

> After extensive deliberations, the Board [of DBTC] has determined that it is in the best interests of Davenport Bank and its stockholders, customers, employees, and the community it serves, to become part of a larger and more diversified financial institution that offers local, national and international resources through what might be termed a personal hometown presence * * *
>
>        *    *    *    *    *    *    *
>
> It is for these reasons that the board has given careful consideration to a merger with an organization that competes aggressively on a regional and national basis, and can provide the Quad-Cities with a broader array of banking products and services.

Following the signing of the agreement, Norwest commenced a due diligence review on DBTC and on DBTC's business activities. DBTC employees and L&W helped Norwest perform the review, which lasted throughout August. L&W primarily acted as the contact for both Norwest and DBTC.

On or about August 29, 1991, Norwest applied to the OCC for approval to consolidate DBTC and BBNA. At or about the same time, a prospectus was filed with the Securities and Exchange Commission (SEC) for the issuance to DBTC shareholders of up to 10 million shares of Norwest common stock upon the consummation of the transaction. The prospectus also served as the proxy statement for a special meeting (special meeting) of DBTC's shareholders to be held on November 26, 1991, for the purpose of

voting on the transaction. The SEC approved the proxy statement, and it became effective on October 23, 1991. On the effective date, DBTC notified its shareholders of the special meeting, advised them that its board recommended voting in favor of the transaction, and mailed them a copy of the proxy statement.

On November 20, 1991, BBNA's board called a special shareholder meeting for December 19, 1991, for the purpose of voting on the transaction.

At the special meeting on November 26, 1991, DBTC's shareholders approved the transaction. Approximately 3 weeks later, BBNA's shareholders approved the transaction.

On or about January 29, 1992, the OCC approved DBTC's consolidation with BBNA, effective January 19, 1992. Shortly before the approval, DBTC and BBNA had entered into an agreement providing that the transaction would be effective as of 12:01 a.m. on the date that it was approved by the OCC. Thus, on January 19, 1992, the transaction became effective. Among other things, (1) DBTC and BBNA were merged to form a consolidated national banking association under BBNA's charter and under the name "Davenport Bank and Trust Company"[3] and (2) New Davenport became a wholly owned subsidiary of Norwest, Norwest exchanging

---

[3] Pursuant to 12 U.S.C. sec. 215 (1994), the statutory provision under which the consolidation took place, the identities of DBTC and BBNA continued in New Davenport. See also DeFoe v. Board of Pub. Instruction, 132 F.2d 971 (5th Cir. 1943); Cannon v. Dixon, 115 F.2d 913 (4th Cir. 1940).

9,665,713 shares of its common stock for the stock of DBTC (other than fractional shares and shares with respect to which dissenter's appraisal rights were exercised and for which $33,341 was paid) and then receiving all the stock of New Davenport in exchange for the stock of DBTC.

Following the transaction, New Davenport carried on a banking business. New Davenport's main office was the same office as DBTC's, and New Davenport's branches were at the four locations at which DBTC had formerly operated (not including the main office) and at each of the three locations at which BBNA had formerly operated (including the location that had been BBNA's main office). New Davenport offered a wider array of products and services than DBTC had offered before the transaction and continued DBTC's tradition of being a charitable and community leader.

DBTC's board and management anticipated that the transaction would produce significant long-term benefits for DBTC and its shareholders, among others.

3. Costs Incurred by DBTC in 1991

During 1991, DBTC paid L&W $474,018 for services rendered ($460,000) and disbursements made ($14,018) during the year. DBTC deducted the $474,018 on its 1991 Federal income tax return.

Petitioner concedes that DBTC's $474,018 deduction was improper, alleging that the deduction should have been $111,270.

DBTC paid $83,450 of the $111,270 for services rendered (and disbursements made) before July 21, 1991, in investigating the products, services, and reputation of Norwest and BBNA, ascertaining whether Norwest and BBNA would be a good business fit for DBTC, and ascertaining whether the proposed transaction with Norwest and BBNA would be good for the Davenport community. None of the $83,450 was for fees or disbursements related to services performed by L&W in negotiating price, working on the fairness opinion, advising DBTC's board with respect to fiduciary duties, or satisfying securities law requirements.

Twenty-three thousand, seven hundred dollars of the $111,270 related to services performed (and disbursements made) by L&W in late July and August 1991 in connection with Norwest's due diligence review. The remainder of the amount alleged to be deductible ($4,120) related to services performed (and disbursements made) by L&W in connection with investigating whether Norwest's director and officer liability coverage would protect DBTC's directors and officers following the transaction, for acts and omissions occurring beforehand. At the time of the services, DBTC had a director and officer policy that was due to expire on January 23, 1992. Norwest agreed with DBTC to maintain insurance until at least January 18, 1995, that would protect DBTC's directors and officers against acts and omissions

occurring before January 19, 1992, the effective date of the transaction.  Norwest eventually bought such a policy.

During 1991, DBTC had 9 executives and 73 other officers (collectively, the officers).  John Figge, James Figge, Thomas Figge, and Richard Horst worked on various aspects of the transaction, as did other officers.  None of the officers were hired specifically to render services on the transaction; all were hired to conduct DBTC's day-to-day banking business.  DBTC's participation in the transaction had no effect on the salaries paid to its officers.  Of the salaries paid to the officers in 1991, $150,000 was attributable to services performed in the transaction.  DBTC deducted the salaries, including the $150,000, on its 1991 Federal income tax return.  Respondent disallowed the $150,000 deduction; i.e., the portion attributable to the transaction.

                            OPINION

Following petitioner's concession that DBTC must capitalize most of the costs related to the transaction, we are left to decide whether DBTC may deduct the officers' salaries and some of its legal fees.  Respondent argues that INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992), requires that these costs be capitalized because, respondent states, the transaction here, like the transaction there, involved a friendly acquisition from which the parties thereto anticipated significant long-term

benefits for the acquired entity.  Petitioner argues that the costs are deductible currently.  Petitioner asserts that the officers' salaries were part of the annual salaries that DBTC agreed to pay the officers to conduct DBTC's everyday banking business, and, although the officers worked on the transaction, this work was tangential to the specific duties they were hired to perform.  Petitioner asserts that the other costs in dispute represent ordinary and necessary expenses which DBTC incurred primarily for investigatory and due diligence services related to the expansion of its business and which, for the most part, were incurred before DBTC's management decided to enter into the transaction.  Petitioner asserts that INDOPCO is not controlling because it did not overrule a long line of cases (e.g., Briarcliff Candy Corp. v. Commissioner, 475 F.2d 775 (2d Cir. 1973), revg. and remanding T.C. Memo. 1972-43, and NCNB Corp. v. United States, 684 F.2d 285 (4th Cir. 1982)), which allowed a deduction for investigatory and due diligence costs incurred incident to the expansion of an existing business.  Petitioner asserts that section 195 and its application to corporate acquisitions support its position.

We agree with respondent that INDOPCO requires us to sustain his determination.  Section 162(a) provides a deduction for an accrual method taxpayer like DBTC only for an expenditure that is:  (1) An expense, (2) an ordinary expense, (3) a necessary

expense, (4) incurred during the taxable year, and (5) made to carry on a trade or business.  See Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971); see also Rule 142(a); INDOPCO, Inc. v. Commissioner, supra at 86; Welch v. Helvering, 290 U.S. 111, 114-116 (1933).  An expense that creates a separate and distinct asset is not "ordinary".  See Commissioner v. Lincoln Sav. & Loan Association, supra at 354; see also FMR Corp. & Subs. v. Commissioner, 110 T.C. 402, 417 (1998); PNC Bancorp, Inc. v. Commissioner, 110 T.C. 349 (1998); Iowa-Des Moines Natl. Bank v. Commissioner, 68 T.C. 872, 878 (1977), affd. 592 F.2d 433 (8th Cir. 1979).  Nor is an expense "ordinary" when it generates a significant long-term benefit that extends beyond the end of the taxable year.  See INDOPCO, Inc. v. Commissioner, supra at 87-88; United States v. Mississippi Chem. Corp., 405 U.S. 298, 310 (1972); Central Tex. Sav. & Loan Association v. United States, 731 F.2d 1181, 1183 (5th Cir. 1984); FMR Corp. & Subs. v. Commissioner, supra at 426; Connecticut Mut. Life Ins. Co. & Consol. Subs. v. Commissioner, 106 T.C. 445, 453 (1996); see also In re Federated Dept. Stores, Inc., 171 Bankr. 603 (S.D. Ohio 1994).  Recognizing income concomitantly with the recognition of the related expenses is a goal of our income tax system, and a proper matching is achieved when an expense is deducted in the taxable year or years in which the related income is recognized. See Newark Morning Ledger Co. v. United States, 507 U.S. 546, 565

(1993); <u>Hertz Corp. v. United States</u>, 364 U.S. 122, 126 (1960); <u>Ellis Banking Corp. v. Commissioner</u>, 688 F.2d 1376, 1379 (11th Cir. 1982), affg. in part and remanding in part on an issue not relevant herein T.C. Memo. 1981-123; <u>Liddle v. Commissioner</u>, 103 T.C. 285, 289 (1994), affd. 65 F.3d 329 (3d Cir. 1995); <u>Simon v. Commissioner</u>, 103 T.C. 247, 253 (1994), affd. 68 F.3d 41 (2d Cir. 1995).

In <u>INDOPCO, Inc. v. Commissioner</u>, <u>supra</u>, the Supreme Court set forth its most recent elucidation on the subject of capitalization.  There, the taxpayer was a public corporation, the two largest shareholders of which were approached in October 1977 about selling their stock in a friendly transaction.  The shareholders indicated that they would part with their stock if a transaction was structured under which they could do so tax free. A tax-free acquisition plan was formulated under which the shareholders could transfer their stock to the acquirer.  Shortly thereafter, the taxpayer's board of directors retained an investment banking firm to evaluate the formal offer for the stock, render a fairness opinion, and generally assist in the event of the emergence of a hostile tender offer.  The transaction was consummated in August 1978.

The Commissioner determined that section 162(a) did not let the taxpayer deduct the direct costs that it incurred to facilitate the transaction; namely:  (1) Investment banking fees

and expenses and (2) legal fees and expenses related to advice given to the taxpayer and its board on their legal rights and obligations with respect to the transaction, the participation in negotiations, the preparation of documents, and the preparation of a request for a ruling from the Commissioner on the tax-free acquisition plan.  We agreed.  We found that it was in the taxpayer's long-term interest to shift ownership of its stock to the acquirer.  See National Starch & Chem. Corp. v. Commissioner, 93 T.C. 67 (1989), affd. 918 F.2d 426 (3d Cir. 1990), affd. sub nom. INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992).  We stated that the expenses were capitalizable because they were incurred incident to a shift in ownership the benefits of "`which could be expected to produce returns for many years in the future.'"  Id. at 75 (quoting E.I. du Pont de Nemours & Co. v. United States, 432 F.2d 1052, 1059 (3d Cir. 1970)).

Our holding was affirmed by the U.S. Court of Appeals for the Third Circuit, which rejected the taxpayer's argument, based on Commissioner v. Lincoln Sav. & Loan Association, supra at 354, that the expenses were not capitalizable because they did not create or enhance a separate and distinct asset.  See National Starch & Chem. Corp. v. Commissioner, 918 F.2d at 428-433.  The Supreme Court also rejected this argument.  The Court stated that Lincoln Savings stands merely for the proposition that an expense must be capitalized under section 263(a)(1) when it serves to

create or enhance a separate and distinct asset.  The Court

noted, however, that the creation or enhancement of a separate

asset is not the sole determinant for capitalization.  The Court

clarified its holding in Lincoln Savings, stating:

> Nor does our statement in Lincoln Savings that
> "the presence of an ensuing benefit that may have some
> future aspect is not controlling" prohibit reliance on
> future benefit as a means of distinguishing an ordinary
> business expense from a capital expenditure.  Although
> the mere presence of an incidental future benefit--
> "some future aspect"--may not warrant capitalization, a
> taxpayer's realization of benefits beyond the year in
> which the expenditure is incurred is undeniably
> important in determining whether the appropriate tax
> treatment is immediate deduction or capitalization.
> Indeed, the text of the Code's capitalization
> provision, section 263(a)(1), which refers to
> "permanent improvements or betterments," itself
> envisions an inquiry into the duration and extent of
> the benefits realized by the taxpayer.  [INDOPCO, Inc.
> v. Commissioner, supra at 87-88; fn. ref. and citations
> omitted.]

The Court concluded that the professional fees before them fell

within the longstanding rule that expenses directly incurred in

reorganizing or restructuring a corporate entity for the benefit

of future operations are not deductible under section 162(a).

The purpose for which these expenses are made, the Court stated,

"'has to do with the corporation's operations and betterment * *

* for the duration of its existence or for the indefinite future

or for a time somewhat longer than the current taxable year'".

Id. at 90 (quoting General Bancshares Corp. v. Commissioner,

326 F.2d 712, 715 (8th Cir. 1964), affg. 39 T.C. 423 (1962)).

On two occasions, we have applied INDOPCO to require capitalization of acquisition-related expenditures. First, in Victory Mkts., Inc. & Subs. v. Commissioner, 99 T.C. 648 (1992), we held that INDOPCO prohibited a taxpayer from currently deducting expenses for professional services incurred incident to a takeover that was not hostile. It appears that these expenses were attributable to an agreement that the taxpayer had with E.F. Hutton to provide advice and services on the takeover. See id. at 652. The taxpayer had argued that these expenses were currently deductible because the takeover was a hostile one from which it received no long-term benefit. We found that the takeover was not hostile and that it generated long-term benefits.

Most recently, in A.E. Staley Manufacturing Co. & Subs. v. Commissioner, 105 T.C. 166 (1995), revd. and remanded 119 F.3d 482 (7th Cir. 1997), we held that INDOPCO prevented the taxpayer from currently deducting expenses for investment bankers' fees and printing costs incurred incident to a takeover. The taxpayer had argued that these expenses were currently deductible because the takeover was hostile. We held that the expenses had to be capitalized because they were incurred incident to the taxpayer's change of ownership from which it derived significant long-term benefits. Upon appeal, the Court of Appeals for the Seventh Circuit disagreed in part. The Court of Appeals held that the

expenses were deductible to the extent that they were not incurred to facilitate the transaction at issue there.

The cases of INDOPCO, Victory Markets, and A.E. Staley all addressed the capitalization of expenses which were incurred as direct costs of effecting a corporate acquisition. In the instant case, by contrast, DBTC incurred the disputed costs before and incidentally with its acquisition. Petitioner focuses on the timing of the disputed costs and invites the Court to allow deductibility of these costs because they were incurred in investigating the expansion of its existing business, before the time that DBTC's management had formally decided to enter into the transaction by approving the agreement. We decline this invitation. The disputed expenses are mostly preparatory expenses that enabled DBTC to achieve the long-term benefit that it desired from the transaction, and the fact that the costs were incurred before DBTC's management formally decided to enter into the transaction does not change the fact that all these costs were sufficiently related to the transaction. In accordance with INDOPCO, the costs must be capitalized because they are connected to an event (namely, the transaction) that produced a significant long-term benefit. To the extent that petitioner relies on cases such as Briarcliff Candy Corp. v. Commissioner, 475 F.2d 775 (2d Cir. 1973), and NCNB Corp. v. United States, 684 F.2d 285 (4th Cir. 1982), for a different result, petitioner's reliance is

misplaced.  We read INDOPCO to have displaced the body of law set forth in Briarcliff Candy and its progeny insofar as they allowed deductibility of investigatory costs in a setting similar to that at hand; i.e., where an expenditure does not create a separate and distinct asset.  Accord FMR Corp. & Subs. v. Commissioner, 110 T.C. 402 (1998).  The Supreme Court granted certiorari in INDOPCO to resolve the conflict among the Courts of Appeals on the requirements for capitalization in the absence of a separate and distinct asset.  The Supreme Court in INDOPCO required that an expense be capitalized when it produces a significant long-term benefit, even when, as is the case here, the expense does not produce a separate and distinct asset.

Petitioner's position on the timing of the investigatory fees is similar to an argument that was rejected by the courts in Ellis Banking Corp. v. Commissioner, T.C. Memo. 1981-123.  There, the taxpayer was a bank holding company that, under State law, had to acquire the stock of other banks or organize new banks in order to expand its business into new geographic markets.  The taxpayer agreed with another bank (Parkway) and certain of Parkway's shareholders to acquire all of Parkway's stock in exchange for taxpayer stock.  The agreement was contingent on the occurrence of certain events.  Before the acquisition, but incident thereto, the taxpayer incurred various expenses conducting a due diligence examination of Parkway's books.  These

expenses were for office supplies, filing fees, travel expenses, and accounting fees.  The taxpayer deducted these expenses, and the Commissioner disallowed the deduction.  The Commissioner determined that the expenses had to be capitalized.

We sustained the Commissioner's disallowance.  We held that the expenses were capital in nature because they were incurred incident to the acquisition of a capital asset.  The Court of Appeals for the Eleventh Circuit agreed.  The taxpayer had argued that the expenses were "ordinary and necessary" because they were incurred in connection with its decision to acquire the stock and in evaluating the market in which Parkway was located.  Ellis Banking Corp. v. Commissioner, 688 F.2d at 1381.  The taxpayer noted that the expenses were incurred before it was bound to buy Parkway's stock.  The Court of Appeals, in rejecting the taxpayer's claim to current deductibility, stated that

> the expenses of investigating a capital investment are properly allocable to that investment and must therefore be capitalized.  That the decision to make the investment is not final at the time of the expenditure does not change the character of the investment; when a taxpayer abandons a project or fails to make an attempted investment, the preliminary expenditures that have been capitalized are then deductible as a loss under section 165.  * * *  As the First Circuit stated, "... expenditures made with the contemplation that they will result in the creation of a capital asset cannot be deducted as ordinary and necessary business expenses even though that expectation is subsequently frustrated or defeated." Union Mutual, 570 F.2d at 392 (emphasis in original). Nor can the expenditures be deducted because the expectations might have been, but were not, frustrated. [Id. at 1382.]

Nor does our reading of section 195 support a contrary conclusion. Recently, in FMR Corp. & Subs. v. Commissioner, supra, we addressed the applicability of section 195 in a context analogous to the setting at hand, holding that section 263(a) required that the taxpayer capitalize the costs which it incurred in developing and launching 82 new regulated investment companies (RIC's). The costs were incurred in a series of activities starting with the development of the idea for the new RIC and continuing with the development of the initial marketing plan, drafting of the management contract, formation of the RIC, obtaining the board of trustee's approval of the contract, and registering the new RIC with the SEC and the States in which the RIC would be marketed. Id. at 413. The taxpayer had argued that section 195 allowed for the current deductibility of all these costs because, it asserted, they were incurred in expanding an existing business. We disagreed. We held that section 195 does not require "that every expenditure incurred in any business expansion is to be currently deductible." Id. at 429.

In sum, we hold that DBTC may not deduct any of the disputed costs because all costs were sufficiently related to an event that produced a significant long-term benefit. Although the costs were not incurred as direct costs of facilitating the event that produced the long-term benefit, the costs were essential to the achievement of that benefit. We have considered all

arguments by petitioner for a contrary holding, and, to the extent not discussed above, find them to be irrelevant or without merit.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.