Dixie Frosted Foods, Inc. v. Commissioner.
Dixie Frosted Foods, Inc. v. Commissioner
Docket No. 11714.
United States Tax Court
1947 Tax Ct. Memo LEXIS 193; 6 T.C.M. (CCH) 586; T.C.M. (RIA) 47145; May 29, 1947
*193 Wade H. Morton, Esq., for the petitioner. John R. Stivers, Esq., for the respondent. KERN The Commissioner determined a deficiency in petitioner's excess profits tax for the taxable year ended February 28, 1943, in the amount of $16,845.77. The question presented is whether there was error on the part of the respondent in the disallowance of a part of the deduction claimed by petitioner on account of salaries paid its president and vice-president. Findings of Fact Some of the facts are stipulated. We find them to be as stipulated, and set them out in substance here, together with other facts established by the evidence. Petitioner was an Alabama corporation engaged in the business of buying, preparing, packing and selling fresh frozen fruits and berries. It filed its income, declared value excess-profits, and excess-profits tax returns for the fiscal year ended February 28, 1943, with the collector of internal revenue for the district of Alabama. Petitioner's business was begun in 1942, the taxable year before us here. Its capital stock consisted of 25 shares, of which twelve were owned by David W. King, twelve by Ray Hosier, and one qualifying share was held *194 by Kenneth Perrine, an attorney. Its par value $100was per share. The entire capital with which petitioner began operations was $2,500 paid in for such stock. Ray Hosier was president, and David W. King was vice-president of petitioner. The three stockholders of record constituted the board of directors. During the year involved here, petitioner paid $13,750 to each of the two officers. Respondent disallowed a total of $18,700 of the $27,500 deduction claimed by petitioner on account of these salaries, and indicated at the time of the hearing that the amount of the salary paid each officer was disallowed as a deduction to the extent of $9,350. Ray Hosier, petitioner's president, is a pioneer in the field of fast-frozen foods. He had been connected with that business, as packer and broker, since 1934. He was in general charge of the petitioner's business, his particular field including the securing of the necessary financial assistance, procuring all supplies, equipment and material necessary to set up and operate the plants, and the selling of the finished product. He was widely and favorably known in that field, and was considered an able business man. David W. King, the vice-president, *195 is a mechanical and refrigeration engineer. He received his technical education at the University of Tennessee. He engaged in scientific research and experimentation in the frozen-foods processes while he was employed by Tennessee Valley Authority. During the period of his work there, he was engaged especially in experimenting with the design and development of new equipment for freezing and handling foods. He was paid $3,000 per year, but he considered the experience gained in his work would be valuable to him in his proposed future in the frozen foods business. After he severed his connection with petitioner, which paid him $15,000, he made in excess of $28,000 per year in the industry. He had as much training and experience in frozen foods as anyone in the Southeast, and has the reputation of being an excellent plant designer, operator and engineer. King's duties with petitioner were primarily to set up the necessary plant facilities for processing strawberries. Petitioner rented a building on a one-year lease, but its foundations required strengthening, and all the equipment necessary to the operation of the business had to be secured or improvised, and installed. Materials were *196 extremely scarce and difficult to secure. Priorities were not yet fully in efficient operation and most of the metals and other materials which would normally have been available and used, were impossible to secure. Such as could be had were secured by Hosier, but others which were unavailable had to be replaced, in many instances by the use of wood, fabricated largely by hand. Petitioner operated two plants in 1942, one at Georgiana, and the other at Montgomery, Alabama, about 70 miles apart. During the season 1,315,140 pounds of strawberries were processed, constituting petitioner one of the large operators in the field. In order to ready the plants for operation, petitioner borrowed about $22,000 before the packing season opened. The strawberries were paid for immediately upon delivery, and petitioner at various times borrowed substantial additional funds from the bank. Collateral was furnished the bank in the form of drafts on petitioner'i customers, with shopping documents or warehouse receipts attached, or in the form of invoices with government purchase orders. Strawberries were picked when fully ripe, and delivered to the petitioner late in the day. They are extremely *197 perishable, and must undergo immediate processing. The packing season lasts about 2 1/2 months and during that time both officers worked eighteen to twenty hours each day, frequently working all night. The employees in the plants were local people, ranging from fourteen to seventy-five years old, untrained in the type of work involved. It was necessary to instruct and train them, in order to comply with state and Federal regulations. Although the period during which the berries are actually packed is short, it was necessary throughout the year to contact growers and encourage the production of berries, and to meet considerable competition in the matter of securing the fruit. Supplies were difficult to secure, and much time, effort and traveling were required on Hosier's part to obtain them. In addition to strawberries, petitioner also processed peaches. The season for packing peaches was July and August, and was less strenuous than strawberry processing. It was not necessary for the officers to work excessively long hours in that phase of petitioner's business. After the close of the peach season, plans and preparations were made by petitioner's officers for carrying on the business *198 on an enlarged scale in the following year. The officers were engaged in preparing the plans for the enlarged venture during the remainder of the year. The plans included the organization of a new corporation to take over petitioner's business, and the construction of a plant to replace the rented structure used in 1942. This construction was begun in the latter part of that year. King sold his interest in the business after the close of the taxable year, and has not been connected with the corporation since, although he is engaged in the frozen foods industry. During the period before us, the customary fee charged by food brokers for the sale of strawberries and peaches was 5% of gross sale price, or, in the case of well-known brands, 4%. At the beginning of petitioner's tax year, the directors provided by resolution that the officers of the corporation should receive salaries commensurate with the annual profits of the corporation, the profits to be determined during the month of February of each year, in time for presentation to the annual stockholders meeting on the third Monday in March. They also provided for monthly drawing accounts of $250 for each officer, the amount *199 drawn to be charged against the salary determined at the end of the year. The resolution further provided that the salaries "* * * shall be fixed and determined after the books have been audited at the end of the fiscal year and it is determined by the profits and losses of the Corporation, the stock held by each officer, the amount of time devoted to the business of the Company." On July 17, 1942, at another meeting of the board of directors, a resolution was adopted which contained the following language: "A discussion was then entered into in regard to the salary of Ray Hosier and David W. King for the work done in the operation of the Company and to carry them through the current year of 1942. After due consideration of the work done by Ray Hosier and David W. King, respectively, and also taking into consideration the amount of profits earned by the Company to the present date and the anticipated profits, it was unanimously moved and carried that the salary for the year 1942 of Ray Hosier be $15,000.00 and the salary of David W. King be $15,000.00." Actually, only $13,750 was paid each officer, and a deduction for only that amount was claimed by petitioner in its tax returns. *200 The salaries so paid, $13,750 for each officer, or $27,500 for both, constituted reasonable compensation for personal services actually rendered to petitioner, and were ordinary and necessary expenses paid by petitioner in carrying on its business. Opinion KERN, Judge: The only question presented here is whether respondent erred in disallowing a total of $18,700 of the $27,500 paid by petitioner to its president and vice-president for their services during the taxable year 1942 and claimed as a deduction under section 23 (a) (1) (A) of the Internal Revenue Code. The relevant facts which should be considered in deciding each of this class of cases on its individual merits have been so well established that neither the citation of authorities nor the particularization of such facts is necessary. In the instant case the record establishes that petitioner's officers were well qualified by training and experience for the tasks which they assumed; that the work was demanding and arduous, requiring considerable technical knowledge, and familiarity with the particular field; that, at times, extraordinarily long hours were required and expended; that the business *201 was eminently successful from the very first, due almost wholly to the ability and industry of the officers; and that after payment of all expenses, including the salaries, the equity of the stockholders, who had invested $2,500 at the beginning of the year, was $6,836.04, represented in large part by cash in the bank. The record shows, also, that the business was of a hazardous nature; that the selling activities alone which Hosier conducted, would have cost more than $9,000 at the brokerage rates then regularly paid in the industry; that the salaries paid here were comparable to those then being paid in similar business; and we are of the opinion that the evidentiary value of the earlier low earnings of King, is at least partly offset by evidence that in subsequent years, in the same type of business, he earned more than $28,000. All of these considerations, and all of the facts shown on the record, have entered into our conclusion, that the salaries paid were reasonable in amount. The respondent is relying mainly on the equal and exclusive stock ownership of the two officers and the failure to pay dividends, a circumstance which invites scrutiny. However, in view of the fact that *202 ample earnings remained in the corporation in liquid form accruing to the benefit of the stockholders we do not feel that this single fact militates against our holding, so long as the salaries were reasonable in amount. Respondent suggests that much of petitioner's profit stemmed from the demands of war, since one of its customers for preserved strawberries was the Government, for its lend-lease program. Had it not been for the zealousness of the individual officers in setting up the necessary plant and equipment in a limited time, so as to be in operation in time to pack the strawberry crop, and their good business reputations, petitioner, of course, would not have been in position to secure the lend-lease orders. This situation differs from that in which an established business receives war orders without the exertion of any substantial effort on the part of its officers. Where, in order either to secure or to execute war orders, special or additional effort is required of individual employees to an extraordinary degree, we know of no rule under which a reasonable compensation for those services would be disallowed as a deduction, simply and solely because the product of the *203 employer corporation was used in connection with the prosecution of the war. The final criticism advanced by the respondent of the deduction of these salaries is that at least some part of the officers' time, after the packing season closed, was spent preparing plans for the erection of a new plant and that compensation for these services should be capitalized. There is evidence that although the actual packing season is relatively short, the business in which petitioner is engaged is a year-around business, in that matters incidental to and preparing, planning, promoting and contracting for the central activity of packing continue through the entire year. Such activities as were performed by the officers looking toward the building of expanded facilities were not, in our opinion, so extraordinary in character, at that particular stage of petitioner's venture, or so definitely compensated by any part of the salaries paid as to bring these facts within the situation comprehended by the decision in Acer Realty Co., 45 B.T.A. 333. There the compensation in question consisted of increases in salaries made by the taxpayer expressly for the services which resulted in the acquisition *204 of capital assets, and no attempt was made by the taxpayer to justify them by reason of any ordinary services performed by the corporate officers as such. Here, the evidence establishes the need for and the performance of services in carrying on the regular business of petitioner throughout the year, and the intention of petitioner that the salaries paid were compensation for those services. We are of the opinion that the officers' salaries here in question constitute reasonable compensation for personal services actually rendered to petitioner and were ordinary and necessary expenses paid by petitioner during the taxable year in carrying on its business. Decision will be entered for the petitioner.