# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3307

_____

WELLS FARGO & COMPANY        )
AND SUBSIDIARIES,            )
                             )
    Petitioner-Appellant,    )
                             ) Appeal from the United
v.                           ) States Tax Court.
                             )
COMMISSIONER OF INTERNAL     )
REVENUE,                     )
    Respondent-Appellee.     )

_____

Submitted:  June 12, 2000
Filed:  August 29, 2000

_____

Before LOKEN and BRIGHT, Circuit Judges, and HAND[1], District Judge.

_____

HAND, United States District Judge for the Southern District of Alabama, sitting by designation.

    This case is before the Court on appeal from the Tax Court, which determined that $150,000 worth of salaries paid to Davenport's corporate officers must be

_____

[1]The Honorable William Brevard Hand, United States District Judge for the Southern District of Alabama, sitting by designation.

capitalized, rather than deducted fully during the year in which the salaries were paid. The Tax Court also held that $111,270 of fees and disbursements paid to Davenport's attorneys must capitalized. The Tax Court determined that the United States Supreme Court case, *INDOPCO, Inc. v. Commissioner*, required capitalization of these expenses. 503 U.S. 79 (1992). It is this Court's determination that the Tax Court is due to be **REVERSED IN PART**.

## FACTUAL HISTORY

For the purposes of this decision, the Court hereby adopts most of the facts found by the Tax Court. The following are the facts, as found by the Tax Court, with only minor changes (noted in brackets), which are made to facilitate continuity within this opinion.

### 1. General Information

Norwest is a bank holding company that was incorporated in 1929. It is the parent corporation of an affiliated group of corporations (Norwest consolidated group) that files consolidated Federal income tax returns. Its affiliates include 79 commercial banks in 12 States and numerous other corporations which provide financial services. Norwest's stock is traded on the New York and Midwest Stock Exchanges.

Bettendorf Bank, National Association ([Bettendorf]), is a member of the Norwest consolidated group. [Bettendorf] is a national banking association operating under a charter granted by the Office of the Comptroller of the Currency (OCC). [Bettendorf] conducts a general banking business from its main office in Bettendorf, Iowa, and from two branches, one in Bettendorf and the other in Davenport, Iowa.

[Davenport] is an Iowa State bank that was incorporated in 1932. Before the transaction (defined below), it provided banking and related services in the four-city area that consists of Davenport, Bettendorf, Rock Island, Illinois, and Moline, Illinois (Quad Cities area). Its main office was in Davenport, and it had four branches, three in Davenport and one in Donahue, Iowa. It filed a consolidated Federal income tax return with two wholly owned subsidiaries.

-2-

[Davenport]'s only class of stock was thinly traded in the Davenport over-the-counter market. It had 1.2 million shares outstanding, and [Davenport]'s founder (V.O. Figge) and his five children (collectively, the Figges) owned, collectively and beneficially, the following numbers and percentages of these shares:

|  | Number | Percentage |
| --- | --- | --- |
| V.O. Figge | 41,843 | 3.5 |
| John K. Figge | 61,140 | 5.1 |
| James K. Figge | 63,450 | 5.3 |
| Thomas K. Figge | 71,855 | 6.0 |
| Ann Figge Brawley | 77,890 | 6.5 |
| Marie Figge Wise | 69,655 | 5.8 |
|  | 385,833 | 32.2 |

[Davenport]'s directors and executive officers, other than the Figges, owned another 69,727 (5.8 percent) of these shares on September 18, 1991.

 2. The Transaction

In 1989, Iowa adopted interstate banking legislation that allowed, for the first time, the acquisition of Iowa banks by banking institutions located in States which were contiguous with Iowa and which had enacted reciprocal legislation. [Davenport]'s management expected that national banking would follow and that many large banks, including some from outside Iowa, would be competing in the Quad Cities area. [Davenport]'s management was concerned that banks of [Davenport]'s size (i.e., larger than the small community banks and smaller than the large regional banks) would be unable to compete in the future.

During 1990, Norwest began talking to [Davenport] about joining their businesses, and these discussions intensified in early 1991. [Davenport] retained the law firm of Lane & Waterman (L & W) to assist

it in these discussions. L & W investigated whether [Davenport] would strategically fit with Norwest and its affiliates, and whether a reorganization between [Davenport] and Norwest would be good for the community.

On June 10, 1991, [Davenport]'s board of directors met to consider merging [Davenport] into Norwest. Over V.O. Figge's objection to the merger, the board authorized John K. Figge, James K. Figge, and Thomas K. Figge, in their capacities as executive officers, to negotiate with Norwest and to hire legal and other representatives with the intent to recommend to [Davenport]'s board a letter of intent between [Davenport] and Norwest on a plan of reorganization. The board also appointed an ad hoc committee (special committee) consisting of four outside directors to perform an independent due diligence review, to obtain professional advice, and to report to [Davenport]'s board as to the fairness and appraisal of the proposed transaction. Norwest's board of directors, on the same day, authorized using up to 10 million shares of Norwest common stock to effect a transaction with [Davenport].

[Davenport] retained J.P. Morgan & Co., Inc., as its financial adviser for any transaction with Norwest and to render an opinion as to the fairness of the consideration that [Davenport]'s shareholders might receive in the transaction. [Davenport] retained KPMG Peat Marwick to render opinions primarily on whether the proposed transaction would be a reorganization for Federal income tax purposes, and whether the proposed transaction would qualify for a desired method of accounting.

On July 22, 1991, [Davenport]'s board met to consider a transaction (transaction) whereby [Davenport] and [Bettendorf] would be consolidated to form a national bank (New Davenport) which would be wholly owned by Norwest. At the meeting, the special committee recommended that the transaction be approved, and J.P. Morgan opined that the transaction was fair to [Davenport]'s shareholders from a financial point of view. [Davenport]'s board approved the transaction. On the same day, [Bettendorf]'s board approved the transaction.

Four other events also occurred on July 22, 1991, with respect to the transaction. First, Norwest, [Bettendorf], and [Davenport] entered into an agreement (agreement) whereby they agreed to the transaction subject to regulatory approval, approval of [Davenport]'s and [Bettendorf]'s shareholders, and the satisfaction of certain conditions which included: (1)

The receipt of regulatory approvals, including the approval of the OCC, without any requirement or condition that Norwest would consider unduly burdensome, and (2) the receipt of Peat Marwick's opinions that the transaction would qualify for the desired method of accounting and as a tax-free reorganization.

Second, Norwest entered into voting agreements with certain [Davenport] shareholders. These shareholders held 24.5 percent of [Davenport]'s stock and included John Figge, James Figge, Thomas Figge, and other members of the Figge family. The voting agreements provided that these shareholders would vote their shares in favor of the transaction and that they would help Norwest complete the transaction.

Third, [Bettendorf] entered into employment agreements with V.O. Figge, John Figge, James Figge, Thomas Figge, and Richard R. Horst. The employment agreements provided that the five listed people would be employed as officers of New Davenport for 1 year at the same salaries they were receiving from [Davenport]. The parties to the transaction contemplated that John Figge, James Figge, and Thomas Figge would become senior vice presidents of New Davenport and that the members of [Davenport]'s board would become members of New Davenport's board. Norwest agreed to cause John Figge to be elected to its board.

Fourth, Norwest issued a press release announcing that it had agreed with [Davenport] to acquire [Davenport]. The release, quoting V.O. Figge, stated in part:

> After extensive deliberations, the Board [of [Davenport] has determined that it is in the best interests of Davenport Bank and its stockholders, customers, employees, and the community it serves, to become part of a larger and more diversified financial institution that offers local, national and international resources through what might be termed a personal hometown presence * * *
>
> * * * * * * *
>
> It is for these reasons that the board has given careful consideration to a merger with an organization that competes aggressively on a regional and national basis, and can provide the Quad-Cities with a broader array of banking products and services.

Following the signing of the agreement, Norwest commenced a due diligence review on [Davenport] and on [Davenport]'s business activities. [Davenport] employees and L & W helped Norwest perform the review, which lasted throughout August. L & W primarily acted as the contact for both Norwest and [Davenport].

On or about August 29, 1991, Norwest applied to the OCC for approval to consolidate [Davenport] and [Bettendorf]. At or about the same time, a prospectus was filed with the Securities and Exchange Commission (SEC) for the issuance to [Davenport] shareholders of up to 10 million shares of Norwest common stock upon the consummation of the transaction. The prospectus also served as the proxy statement for a special meeting (special meeting) of [Davenport]'s shareholders to be held on November 26, 1991, for the purpose of voting on the transaction. The SEC approved the proxy statement, and it became effective on October 23, 1991. On the effective date, [Davenport] notified its shareholders of the special meeting, advised them that its board recommended voting in favor of the transaction, and mailed them a copy of the proxy statement.

On November 20, 1991, [Bettendorf]'s board called a special shareholder meeting for December 19, 1991, for the purpose of voting on the transaction.

At the special meeting on November 26, 1991, [Davenport]'s shareholders approved the transaction. Approximately 3 weeks later, [Bettendorf]'s shareholders approved the transaction.

On or about January 29, 1992, the OCC approved [Davenport]'s consolidation with [Bettendorf], effective January 19, 1992. Shortly before the approval, [Davenport] and [Bettendorf] had entered into an agreement providing that the transaction would be effective as of 12:01 a.m. on the date that it was approved by the OCC. Thus, on January 19, 1992, the transaction became effective. Among other things, (1) [Davenport] and [Bettendorf] were merged to form a consolidated national banking association under [Bettendorf]'s charter and under the name "Davenport Bank and Trust Company" and (2) New Davenport became a wholly owned subsidiary of Norwest, Norwest exchanging 9,665,713 shares of its common stock for the stock of [Davenport] (other than fractional shares and shares with respect to which dissenter's appraisal rights were exercised and for which $33,341 was paid) and then

receiving all the stock of New Davenport in exchange for the stock of [Davenport].

Following the transaction, New Davenport carried on a banking business. New Davenport's main office was the same office as [Davenport]'s, and New Davenport's branches were at the four locations at which [Davenport] had formerly operated (not including the main office) and at each of the three locations at which [Bettendorf] had formerly operated (including the location that had been [Bettendorf]'s main office). New Davenport offered a wider array of products and services than [Davenport] had offered before the transaction and continued [Davenport]'s tradition of being a charitable and community leader.

[Davenport]'s board and management anticipated that the transaction would produce significant long-term benefits for [Davenport] and its shareholders, among others.

 3. Costs Incurred by [Davenport] in 1991

During 1991, [Davenport] paid L & W $474,018 for services rendered ($460,000) and disbursements made ($14,018) during the year. [Davenport] deducted the $474,018 on its 1991 Federal income tax return.

Petitioner concedes that [Davenport]'s $474,018 deduction was improper, alleging that the deduction should have been $111,270. [Davenport] paid $83,450 of the $111,270 for services rendered (and disbursements made) before July 21, 1991, in investigating the products, services, and reputation of Norwest and [Bettendorf], ascertaining whether Norwest and [Bettendorf] would be a good business fit for [Davenport], and ascertaining whether the proposed transaction with Norwest and [Bettendorf] would be good for the Davenport community. None of the $83,450 was for fees or disbursements related to services performed by L & W in negotiating price, working on the fairness opinion, advising [Davenport]'s board with respect to fiduciary duties, or satisfying securities law requirements.

Twenty-three thousand, seven hundred dollars of the $111,270 related to services performed (and disbursements made) by L & W in late July and August 1991 in connection with Norwest's due diligence review. The remainder of the amount alleged to be deductible ($4,120) related to services performed (and disbursements made) by L & W in connection

with investigating whether Norwest's director and officer liability coverage would protect [Davenport]'s directors and officers following the transaction, for acts and omissions occurring beforehand. At the time of the services, [Davenport] had a director and officer policy that was due to expire on January 23, 1992. Norwest agreed with [Davenport] to maintain insurance until at least January 18, 1995, that would protect [Davenport]'s directors and officers against acts and omissions occurring before January 19, 1992, [. . .]. Norwest eventually bought such a policy.

During 1991, [Davenport] had 9 executives and 73 other officers (collectively, the officers). John Figge, James Figge, Thomas Figge, and Richard Horst worked on various aspects of the transaction, as did other officers. None of the officers were hired specifically to render services on the transaction; all were hired to conduct [Davenport]'s day-to-day banking business. [Davenport]'s participation in the transaction had no effect on the salaries paid to its officers. Of the salaries paid to the officers in 1991, $150,000 was attributable to services performed in the transaction. [Davenport] deducted the salaries, including the $150,000, on its 1991 Federal income tax return. Respondent disallowed the $150,000 deduction; i.e., the portion attributable to the transaction.

*Norwest Corp. and Subsidiaries v. Commissioner*, 112 T.C. 89 (1999) (footnotes omitted).[2]


## ISSUES OF LAW

The issue before this Court is twofold: 1) whether the Tax Court erred in holding that $150,000 of Davenport's officer's salaries must be capitalized and 2) whether the Tax Court erred in holding that $111,270 of Davenport's legal expenses associated with its consolidation must be capitalized. These are questions of law which the Court will review *de novo*.

---

[2]The caption of this case on Appeal lists "Wells Fargo" as the Petition-Appellant, rather than Norwest. This is due to another (subsequent) bank merger.

The Internal Revenue Code allows deductions for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." I.R.C. §162(a). On the other hand, "§263 of the Code allows no deduction for a capital expenditure— an 'amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate.'" *INDOPCO Inc. v. Commissioner*, 503 U.S. 79, 83 (1992) *(quoting* I.R.C. §263). To qualify for a deduction, "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *Commissioner v. Lincoln Savings and Loan Assoc.,* 403 U.S. 345 (1971). The parties to this case agree that the first four requirements are met here. However, it is disputed whether the expenses in this case can properly be characterized as "ordinary".

The principle function of the term "ordinary" is to distinguish a deductible expense from one that is capital. *Commissioner v. Tellier*, 383 U.S. 687, 689-90 (1966). An ordinary expense may be fully deducted during the taxable year. A capital expenditure, on the other hand, must be depreciated over the life of the asset with which the expenditure is associated, or, where no specific asset or useful life can be ascertained, it is deducted upon dissolution of the enterprise. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 83-84 (1992). The Tax Court determined that none of the expenses at issue here were ordinary. Therefore, the Tax Court held that all of the expenses must be capitalized rather than deducted. For the reasons set forth below, the Tax Court's decision is due to be **REVERSED**.

**Supreme Court Precedents**

The Tax Court erred in its interpretation of the *INDOPCO* case. In order to most effectively explain the Tax Court's error in logical reasoning, this Court will first analyze another Supreme Court case, *Lincoln Savings*, which spurred similar logical

fallacies among the Circuit Courts of Appeals. Eventually, the Supreme Court decided *INDOPCO* in an attempt to clarify the meaning of *Lincoln Savings*.

### Lincoln Savings

In 1971, the Supreme Court decided the case of *Commissioner v. Lincoln Savings and Loan Ass*oc.*, 403 U.S. 345 (1971). In *Lincoln Savings*, the issue was whether a Savings and Loan association could deduct an "additional premium" which it paid to the Federal Savings and Loan Insurance Corporation (FSLIC). Initially Savings and Loan companies were only required to pay one premium to the FSLIC. However, beginning January 1, 1962, the insureds were required to pay two premiums. The first premium funded the Primary Reserve, which was a general insurance fund for all participants. The "additional premium" funded the Secondary Reserve, of which Lincoln held a pro rata share. In other words, Lincoln had an actual property interest in the Secondary Reserve. For reasons more fully explained in the text of the *Lincoln Savings* decision, the Supreme Court determined that the "additional premium" paid by Lincoln created or enhanced a separate and distinct additional asset for Lincoln. One of the arguments put forth by Lincoln was "that the possibility of a future benefit from the expenditure does not serve to make it capital in nature as distinguished from an expense." *Id.* at 354. Responding to this argument, the Court stated, "the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year." *Id.* Justice Blackmun continued: "What is important and controlling, we feel, is that the [additional premium] payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under §162(a). . . ." *Id.*

No less than five of the Federal Circuit Courts of Appeals erroneously interpreted the above quoted language from *Lincoln Savings* to mean that the Supreme

Court had adopted a new test for determining whether an expenditure was currently deductible or must be capitalized. *See e.g. Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775 (2nd Cir. 1973); *NCNB Corp. v. United States*, 684 f.2d 285 (4th Cir. 1982); *Central Texas Savings & Loan Assoc. v. United States*, 731 F.2d 1181 (5th Cir. 1984); *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir. 1974); *First Security Bank of Idaho v. Commissioner*, 592 F.2d 1050 (9th Cir. 1979) (adopting the 10th Circuit's *Colorado Springs* decision). Each of these Circuits, in response to the *Lincoln Savings* decision, adopted a new "separate and distinct additional asset" test, or some variation thereof. The new test permitted necessary business expenditures to be fully deducted during the taxable year *unless* the expenditure created or enhanced a separate and distinct additional asset.

The Courts which adopted this new test tended to focus on two assertions made by Justice Blackmun: 1) the presence of a "future benefit" characteristic is "*not controlling*", and 2) it was *important and controlling* that a separate and distinct asset had been created by the expenditure. *See Briarcliff*, 475 F.2d at 782; *NCNB Corp.*, 684 F.2d at 289, 291; *Central Tex. Sav.*, 731 F.2d at 1184; *Colorado Springs*, 505 F.2d at 1192. These Circuits misunderstood *Lincoln Savings* to hold that *only* expenditures which created or enhanced a distinct asset should be capitalized, and all other expenditures, regardless of their "future benefit" characteristics, should be deducted.

Such a mistake in logic is quite simple and all too common. However, the impact of such a fallacy is dramatic. "In order to give precision to our ideas and eliminate the risk of confusion resulting from the somewhat vague meanings attached to words in ordinary usage, it is sometimes helpful to use arbitrary symbols in place of words." WADDELL, WARD JR., STRUCTURE OF LAWS: AS REPRESENTED BY SYMBOLIC METHODS 1 (1961). Therefore, to simplify this analysis we can speak in terms of logic equations and diagrams, using the following symbols:

A = physical capital ASSET created or enhanced;

~A[3] = NO physical capital ASSET created or enhanced;

B = BENEFIT beyond the taxable year;

~B = NO Benefit beyond the taxable year;

R = the expense is *directly* Related to B;

~R = the expense is only *indirectly* Related to B;

C = CAPITALIZE;

~C = do NOT Capitalize =[4]

D = DEDUCT.

*Lincoln Savings*, held that if an expenditure creates or enhances a separate and distinct physical asset, *then* you must capitalize that expenditure. *Lincoln Savings* 403 U.S. at 354 (because the payments created or enhanced a capital asset, "as an *inevitable consequence*, the payment is capital in nature. . . ." (emphasis added)). In other words, "if A then C".[5] The mistake in logic occurs when courts misread "if A then C" as if it

---

[3]The "squiggly" line (~) is properly known as the "not" symbol. Therefore, ~A is read "not A".

[4]We can say that ~C is equal to a deduction because we are assuming all other requirements for deduction are present. If the expense is ordinary, then it will not be capitalized but will instead be deducted.

[5]In fact, this expression is best symbolized as: **A➜C**. See WADDELL, Supra at 4. However, for the ease of readers who are unaccustomed to interpreting many of the symbols used in logical equations, the body of this opinion will intermix language with symbols.

read "*only* if A then C".[6]  Clearly, the two statements are different and yield different results.  Another way to misstate the holding of *Lincoln Savings* is to say "if ~A then ~C,"[7] but this too is not interchangeable with the actual holding, "if A then C."  An equally poor reading of the term "if A then C", would be "if C then A."[8]  Unless two terms are proven to be reflexive of one another, they can not be haphazardly interchanged.  And yet these are the very mistakes in logic that some Circuits were laboring under while misinterpreting *Lincoln Savings*.  By establishing a "new test" which would not require capitalization unless a new asset was created, those courts were reading *Lincoln Savings* to hold one of the following: 1) "if C then A", 2) "*only* if A then C" or 3) "if ~A then ~C", none of which is equivalent to the true holding, "if A then C."

Furthermore, in *Lincoln Savings*, Justice Blackmun wrote, "the presence of an ensuing benefit that may have some future aspect is *not controlling*; many expenses concededly deductible have prospective effect beyond the taxable year." (emphasis added) *Lincoln Savings*, 403 U.S. at 354.  Using our logic terms, we can re-write this statement: "B    C." (B does not equal C.)  This however, was misunderstood to mean that B is irrelevant when trying to determine C.  This simply is not true.  When determining whether a necessary business expenditure must be capitalized or deducted, it is of critical importance to determine whether the expenditure resulted in a long term

---

[6]Once again the proper symbolic expression is: **C    A** (which is properly read, "C, if, and only if, A.")  *Id.*  For ease of reading, we will simply substitute the phrase "only if A then C" for the term **C    A**.  Symbolically however, it is clear that (**A➡C**)    (**C    A**).

[7]~**A➡~C**.  *Id.*

[8]**A➡C** is not necessarily equivalent **C➡A**.

benefit (B).  *INDOPCO*, 503 U.S. at 87, 88 (Justice Blackmun once again writing for the Court).

### *INDOPCO v. Commissioner*

After more than twenty years of confusion and disagreement among the Circuits, the Supreme Court issued its opinion in *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992).  Once again writing for the Court, Justice Blackmun attempted to clarify the holding of *Lincoln Savings*.  "Lincoln Savings stands for the simple proposition that a taxpayer's expenditure that 'serves to create or enhance. . . a separate and distinct' asset should be capitalized under §263.  It by no means follows, however, that only expenditures that create or enhance separate and distinct assets are to be capitalized under §263."  *Id.* at 86, 87.  Thus, *INDOPCO* clearly and unequivocally demonstrates that statements such as "*only* if A then C", and "if ~A then ~C" are false statements.  Justice Blackmun continues his explanation of *Lincoln Savings* by stating: "In short, Lincoln Savings holds that the creation of a separate and distinct asset well may be a sufficient, but not a necessary, condition to classification as a capital expenditure."  *Id.* at 87.  So it appears that the inquiry may end once it is determined that the expenditure DID create a separate and distinct asset (A).  This would be true because, it is "an inevitable consequence [that] the payment is capital in nature" when it "serves to create or enhance . . . a separate and distinct additional asset."  ("if A then C")  *Lincoln Savings*, 403 U.S. at 354.  On the other hand, the inquiry continues if it is determined that the expenditure DID NOT create a new capital asset (~A).  And this was the point of the *INDOPCO* case.

In *INDOPCO*, the Supreme Court required capitalization of expenses incurred by the target corporation during a planned friendly takeover by another company.  503 U.S. at 90.  To facilitate a friendly takeover, the taxpayer in *INDOPCO* paid for investment banking services, legal services, and miscellaneous expenses *directly*

related to the takeover.[9]  Unlike the case at hand, *INDOPCO* was not a situation wherein the Commissioner sought to capitalize portions of the taxpayers salary expenditures.  Citing *Lincoln Savings* as authority, the taxpayer in *INDOPCO* argued that although the expenditures at issue were directly related to the takeover, and provided the taxpayer with long term benefits, they did not create or enhance a separate and distinct asset and therefore should not be capitalized.  (See Pet. Br. in *INDOPCO* at 1991 WL 521588).  In other words, the taxpayer argued the false proposition "if ~A then ~C."  As explained above, Justice Blackmun dispelled such a notion.  In an effort to drive home this point, and eliminate the myth that long term benefits (B) are irrelevant when deciding whether to capitalize or deduct, the Court wrote:

> Nor does our statement in Lincoln Savings, that "the presence of an ensuing benefit that may have some future aspect is not controlling" prohibit reliance on future benefit as a means of distinguishing an ordinary business expense from a capital expenditure.  Although the mere presence of an incidental future benefit--"some future aspect"--may not warrant capitalization, a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization.

(citation omitted) (footnote omitted) *INDOPCO*, 503 U.S. at 87.


This tells the reader that B is "undeniably important in determining whether" D or C is "the appropriate tax treatment."  *Id.*  In fact B is "a prominent, if not predominant, characteristic of a capital item." *Id.* at 87, 88.  On the other hand, *Lincoln Savings* tells the reader that "the *presence* of [B] is not controlling. . . ."  Is it possible the same Justice wrote both of these apparently contradictory statements without intending to contradict himself?  The answer is "yes".  In *Lincoln Savings*, the issue of

---

[9]This *direct* relationship becomes important later in the analysis.

B was not controlling because it became moot once the Court decided that the expenditure created or enhanced a separate and distinct asset. Such an asset, by its very nature, is capital, and the associated expenses must therefore be capitalized ("if A then C"). *INDOPCO* points out that a prominent characteristic of a capital item is that it provides B ("if C then B"). Building on the two propositions "if A then C"[10] and "if C then B"[11], we can conclude "if A then C then B."[12] Put more simply, "if A then B."[13] This conclusion not only follows logically, but it also makes legal sense. Essentially, we are saying that <u>if an expenditure creates or enhances a separate and distinct asset, then it is a capital item which (by its very nature) provides long term benefits and must be capitalized</u>. *See e.g. Lincoln Savings* 403 U.S. at 354; *See e.g. INDOPCO* 503 U.S. at 86-88. This is the holding of *Lincoln Savings* as explained by *INDOPCO*.

According to *INDOPCO* there are occasions when an expenditure does not create a new asset (~A), and yet the expense must still be capitalized (C). However, we also know that there are occasions when ~A results in a deduction (D). Thus we conclude, "if ~A then (C or D)." How then do we determine whether capitalization or deduction is the proper tax treatment when considering an expenditure which does not create or enhance a separate and distinct asset (~A)? This determination is dependant, to a certain extent, on the presence of a long term benefit (B) associated with the expenditure. If there is not a long term benefit (~B) associated with the expenditure,

---

[10]*See Lincoln Savings* 403 U.S. at 354.

[11]*See INDOPCO* 503 U.S. at 86-88.

[12]WADDELL supra at 7.

[13]*Id.*

then the appropriate tax treatment is current deduction.[14]  This, of course, is true because "the [Internal Revenue] Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes."  *INDOPCO* 503 U.S. at 84.  If there is no long term benefit, there is no need to postpone the tax benefit into later years.[15]

On the other hand, what if the expenditure does not create or enhance a separate and distinct asset (~A), but *does* provide a long term benefit (B)?  There is no easy answer for this question.  Which is why Justice Blackmun wrote in *INDOPCO*,

> The Court has recognized, however, that the "decisive distinctions" between current expenses and capital expenditures "are those of degree and not of kind," *Welch v. Helvering*, 290 U.S., at 114, 54 S.Ct., at 9, and that because each case "turns on its special facts," *Deputy v. Du Pont*, 308 U.S., at 496, 60 S.Ct., at 367, the cases sometimes appear difficult to harmonize.  *See Welch v. Helvering*, 290 U.S., at 116, 54 S.Ct., at 9.

*INDOPCO* 503 U.S. at 86.

Justice Cardozo most appropriately wrote "[o]ne struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not

---

[14]This concept can be expressed as follows:  "if (~A and ~B) then D".  Or more precisely:  ~**A**  ~**B**➡**D**.

[15]Thus, the concepts expressed in the previous footnote can be even more concisely expressed as follows:  "if ~B then D"; or in pure symbols:  ~**B**➡**D**.  In fact, whether or not B exists ought to be the first question when trying to determine whether the proper tax consequence is capitalization or current deduction.  Because without B the result will always be D.  However, if B is present the analysis continues.

a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." Welch v. Helvering, 290 U.S. 111, 114 (1933).

### The Tax Court's Illogical Reading of *INDOPCO*

From *Lincoln Savings* we established that "B C." And we have established from *INDOPCO*, "if C then B." Thus, the statement, "if B then C" is false and not reflexive with the true statement "if C then B." The veracity of this conclusion is demonstrated when the Supreme Court writes in *INDOPCO* that "the mere presence of an incidental future benefit [**B**]--'some future aspect'-- may not warrant capitalization [**C**]." *INDOPCO*, 503 U.S. at 87. Likewise, the Court stated in *Lincoln Savings* that "many expenses concededly deductible have prospective effect beyond the taxable year." So it is safe to say that the statement "B C" is a true statement, while the statement "if B then C" is a false statement. This brings us to the error made by the Tax Court in the instant case.

In essence, the Tax Court committed a similar error in logic as was committed by the Courts of Appeals which improperly interpreted the *Lincoln Savings* decision. As explained above, one way to misread the *Lincoln Savings* holding ("if A then C") was to read it in the reflexive so that it read "if C then A." Similarly, it would be wrong to interpret the *INDOPCO* proposition, "if C then B", as if it read "if B then C." But this is essentially what the Tax Court did in the instant case.

The Tax Court initially erred when it failed to perform an independent analysis to determine the fate of Davenport's officers' salaries, and another for the investigatory costs associated with the acquisition. Instead, the Tax Court lumped the two together and found that Davenport "incurred the disputed costs *before and incidentally* with its acquisition." (emphasis added) *Norwest Corp. and Subsidiaries v. Commissioner*, 112 T.C. 89, 100 (1999). The Tax Court went on to hold: "In accordance with INDOPCO, [all] the costs must be capitalized because they are connected to an event (namely, the

-18-

transaction) that produced a significant long-term benefit." *Id.* at 100. This is a misinterpretation of *INDOPCO*. The Tax Court is saying that C must result because of the presence of B. This is equivalent to "if B then C," which we have previously proven to be a false statement.[16] Herein lies the mistake of the Tax Court. Just as the Court in *Lincoln Savings* did not create a new test for determining whether current deduction or capitalization is the proper tax consequence of an expenditure, it also did not create a new test in the *INDOPCO* case. Therefore, it is not proper to decide that a cost must be capitalized solely because the fact finder determines that the cost is 'incidentally' 'connected' with a long term benefit. This is supported by both *Lincoln Savings* and *INDOPCO*. *Lincoln Savings* states, "many expenses concededly deductible have prospective effect beyond the taxable year." 403 U.S. at 354. Likewise, *INDOPCO* states, "the mere presence of an incidental future benefit--'some future aspect'--may not warrant capitalization. . . ." 503 U.S. at 87. Thus, the Court did not create a new test requiring capitalization whenever an expenditure is incidentally connected with some future benefit.[17] On the contrary, *INDOPCO* points out that federal courts have "long" required capitalization of expenses similar to those at issue in *INDOPCO*. 503 U.S. at 89.

Therefore, we conclude it was error for the Tax Court to require capitalization of the expenses at issue simply because they were incidentally connected with a future benefit. Instead, the Tax Court should have performed an independent and appropriate

---

[16]As a reminder to the reader, it was demonstrated earlier that the holding of *INDOPCO* was, "if C then B," and this is not equivalent to the statement, "if B then C."

[17]"If one really takes seriously the concept of a capital expenditure as anything that yields income, actual or imputed, beyond the period (conventionally one year) in which the expenditure is made, the result will be to force the capitalization of virtually every business expense. It is a result courts naturally shy away from. . . . The administrative costs of conceptual rigor are too great." *Encyclopaedia Britannica, Inc. v. Commissioner*, 685 F.2d 212, 217 (7th Cir. 1982) (citation omitted).

legal analysis  to determine whether each of the expenditures at issue were 'ordinary'.[18] In addition to the previously cited characteristics of an 'ordinary' expense, an additional qualification is that "the expense must relate to a transaction 'of common or frequent occurrence in the type of business involved.'" *INDOPCO*, 503 U.S. at 85, 86 (quoting *Deputy v. Du Pont*, 308 U.S. 488, 495 (1940)).

### Davenport's Officers' Salaries are a Fully Deductible Expense

Lest one should doubt that paying salaries to corporate officers is a transaction "of common or frequent occurrence" in the business world, we note that courts have traditionally permitted current deductions for expenses attributable to salaries similar to those at issue here.  *See e.g. Dixie Frosted Foods, Inc. v. Commissioner*, 6 T.C.M. (CCH) 586 (1947);  *Fort Howard Paper Co. v. Commissioner*, 49 T.C. 275 (1967). However, "*INDOPCO*, which signaled that the Supreme Court's previously announced tests for capitalization were not exhaustive, may well have been viewed by the IRS as a green light to seek capitalization of costs that had previously been considered deductible in a number of businesses and industries."  *PNC Bancorp, Inc., v. Commissioner*, 2000 WL 655747, *3 (3rd Cir.).

The Tax Court erred when it so easily dismissed a major distinction between the instant case and *INDOPCO*.  The *INDOPCO* case addressed costs which were *directly* related to the acquisition, while the instant case involves costs which were only *indirectly* related to the acquisition. *Norwest Corp. and Subsidiaries v. Commissioner*, 112 T.C. 89, 100 (1999).  According to cases which explain and apply the "origin of the claim doctrine", such a distinction effects the outcome of the case.  *See Woodward v. Commissioner*, 397 U.S. 572 (1970); *United States v. Hilton Hotels Corp.*, 397 U.S. 580 (1970)*; Deputy v. DuPont*, 308 U.S. 488, 494 (1940).

---

[18]It was established above that the expenses at issue here meet the other requirements for deductibility.

Although the "origin of the claim doctrine" was originally used to distinguish personal expenses from business expenses, it has been extended to distinguish capital business expenses from ordinary business expenses. When used in this context, the ultimate question is whether the expense is directly related to the transaction which provides the long term benefit. The IRS has applied this "origin" analysis in a number of recent private rulings while holding compensation payments to employees are deductible in the context of acquisitions. *See* TAM 9540003 (6/30/1995); PLR 9326001 (03/18/1993); TAM 9527005 (03/15/1995); TAM 9721002 (01/24/97); TAM 9731001 (01/31/1997). According to I.R.C. §6110 these private rulings (known as Technical Advice Memoranda and Private Letter Rulings) have no precedential value, but they do "reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws" and may provide evidence of the proper construction of the statute. *Hanover Bank v. Commissioner*, 369 U.S. 672, 686 (1962); *see also Oetting v. United States*, 712 F.2d 358, 362 (8th Cir.1983) (Revenue Ruling, while not controlling authority, was persuasive).

This Court is hesitant to fully incorporate and adopt the private rulings of the IRS.[19] However, we certainly agree that payments made by an employer are deductible when they are made to employees, are compensatory in nature, and are directly related to the employment relationship (and only indirectly related to the capital transaction,

---

[19]For instance, although this Court agrees with the "origin of the claim" analysis performed by the I.R.S. in the cited rulings, we do not agree with statements like, "[g]enerally, expenditures ***incident*** to the alteration of the capital structure of a corporation for the benefit of future operations constitute non-deductible capital expenditures under section 263 of the Code." (emphasis added) TAM 9540003 (06/30/1995). This Court does not agree that expenditures which are merely "incidental to" an acquisition or merger necessarily are non-deductible. This is particularly true if one understands the phrase "incidental to" to be equivalent with "indirectly related to".

which provides the long term benefit).[20]  *See e.g.,* TAM 9540003 (6/30/1995). Likewise, it is true that,

> a deductible expense is not converted into a capital expenditure solely because the expense is incurred as part of the terms of a corporate reorganization.  Rather, the important consideration in determining the nature of an expenditure for tax purposes is the origin and character of the claim for which the expenditure is incurred.  *See Woodward v. Commissioner*, 397 U.S. 572, 577 (1970); *United States v. Gilmore*, 372 U.S. 39, 47 (1963).  Under the "origin of the claim doctrine," the character of a particular expenditure is determined by the transaction or activity from which the taxable event proximately resulted. *Gilmore*, 372 U.S. at 47. . . .  In the present case, . . . the origin of the payments was not the acquisition, but rather the employment relationship between the taxpayer and [its employees].

TAM 9540003 (06/30/1995).

Thus the distinction between the case at hand, and the *INDOPCO* case lies in the relationship between the expense at issue and the long term benefit.  In *INDOPCO*, the expenses in question were directly related to the transaction which produced the long term benefit.  Accordingly, the expenses had to be capitalized.  *See INDOPCO*, 503 U.S. 79.  We conclude that if the expense is *directly* related to the capital transaction

---

[20]Symbolically, this can be generally expressed:  **(~A B) (~R)➡D**,  which states, "if the expense does not create a new asset, but does generate a long term benefit, and the expense is only indirectly related to the long term benefit, then the expense is deductible."  We do not endeavor to explain exactly how one determines whether the expense is properly characterized as **R** or ~**R**.  This is one of the questions which will turn on the particular facts and circumstances of each case.  It will suffice to say that in this case we determine the salary expenses to be directly related to the employment relationship and only indirectly (or incidentally) related to the acquisition (which provides **B**).

(and therefor, the long term benefit), then it should be capitalized.[21]  *See e.g. INDOPCO*, 503 U.S. 79 (1992).  In this case, there is only an *indirect* relation between the salaries (which originate from the employment relationship) and the acquisition (which provides the long term benefit [B]).

Similarly, the instant case is distinguishable from *Acer Realty Co. v. Commissioner*[22], wherein this Court held that the salaries paid to two officers for "unusual, nonrecurrent services" had to be capitalized.  132 F.2d 512, 513 (8th Cir. 1942).  The taxpayer was a corporation whose only business was leasing real estate to a related corporation.  Its officers were paid no salaries prior to their undertaking a large building program, at which point the two officers began acting as general contractors and "performed all the services necessary to the management of the construction of the buildings."  *Acer Realty*, 132 F.2d at 514.  Because the salaries were clearly and directly related to the capital project, this Court determined that most of the salaries paid were extraordinary or incremental expenses which had to be capitalized.  *Acer Realty Co. v. Commissioner*,  132 F.2d 512 (8th Cir. 1942).

The instant case is easily distinguishable from *Acer Realty* because Davenport's officers had always received salaries, even before the acquisition was a possibility.  There was no increase in their salaries attributable to the acquisition, and they would have been paid the salaries whether or not the acquisition took place.  Therefore, we determine that the salary expenses in this case originated from the employment

---

[21]Symbolically expressed as: **(~A  B)(R)➡C**,  which states, "if the expense does not create a new asset, but does generate a long term benefit, and the expense is directly related to the long term benefit, then the expense must be capitalized."

[22]*Acer Realty* is the only case in our Circuit, that we are aware of, which denies the taxpayer a deduction for salary expenses.

relationship between the taxpayer and its officers. Indirectly, the payment of these salaries provided Davenport with a long term benefit.

By comparing the relevant symbolic expressions, one can easily see the distinction between cases like *INDOPCO* (which require capitalization) and cases wherein deduction would be permissible. The former is "**(~A B)(R)**", and the latter is "**(~A B)(~R)**": the only difference being the direct/indirect relationship between the expense and the long term benefit it provides.

Upon consideration of the facts and circumstances of this case, we determine that Davenport's salary expenses are directly related to (and arise out of) the employment relationship, and are only indirectly related to the acquisition itself. Furthermore, this case more closely parallels those cases and IRS rulings which have traditionally permitted a current deduction for expenses attributable to employee compensation. Wherefore, Davenport's officers' salaries are a fully deductible expense. *See Woodward v. Commissioner*, 397 U.S. 572 (1970); *United States v. Hilton Hotels Corp.*, 397 U.S. 580 (1970)*; Deputy v. DuPont*, 308 U.S. 488, 494 (1940); TAM 9540003 (6/30/1995); PLR 9326001 (03/18/1993); TAM 9527005 (03/15/1995); TAM 9721002 (01/24/97); TAM 9731001 (01/31/1997).

### Davenport's Legal/Investigatory Expenses

It is undisputed by the parties that the Tax Court erred when it determined that *INDOPCO* required capitalization of all of Davenport's legal fees, paid to Lane & Waterman. The Commissioner now agrees that at least $83,450 of Davenport's legal expenses may be deducted, because they were attributable to the "investigatory stage" of the transaction. Thus, the parties only disagree as to whether the remaining $27,820 in fees ought to be characterized as capital expenditures or deductible "investigatory costs".

-24-

Both parties rely on the IRS's Revenue Ruling 99-23 to argue their respective positions. Obviously, the Commissioner takes the position that the remaining fees should be capitalized, and Petitioner argues the fees may be deducted (either fully or at least partially). Before deciding this matter, the Court will analyze the Revenue Ruling in question.

The issue under consideration in Revenue Ruling 99-23 was stated as follows: "When a taxpayer acquires the assets of an active trade or business, which expenditures will qualify as investigatory costs that are eligible for amortization as start-up expenditures under §195 of the Internal Revenue Code?" At first blush this Issue may not seem pertinent to the case at hand, because it deals with "amortization" of "start-up" costs. However, one requirement for an expense to be eligible for amortization under §195 is that it be an expense which would be deductible if it were incurred by an existing business. For this reason, the IRS discussed the differences between "investigatory" expenses which may be deducted, versus those expenses which must be capitalized.

The IRS determined that investigatory expenses which are related to the questions "*whether* to acquire a business" and "*which* business to acquire" are properly deductible. On the other hand, once the "whether" and "which" questions have been answered, and the "final decision" is made to acquire a particular business, then any further "investigatory" expenses become expenses attributable to facilitating consummation of the acquisition. According to the IRS, these facilitating expenses are not deductible.

Along with the parties, this Court agrees with the IRS that any investigatory expenses which post-date the "final decision" to acquire a business ought to be capitalized. The parties in this case disagree, however, as to when the "final decision" occurred.

Without adopting all of the IRS's conclusions in Revenue Ruling 99-23, this Court agrees that:

> [t]he nature of the cost must be analyzed based on all the facts and circumstances of the transaction to determine whether it is an investigatory cost incurred to facilitate the whether and which decisions, or an acquisition cost incurred to facilitate consummation of the acquisition. The label that the parties use to describe the cost and the point in time at which the cost is incurred do not necessarily determine the nature of the cost.

Rev. Rul. 99-23.

Based on the facts and circumstances of this case, and after reviewing all pertinent portions of the record, it is the determination of this Court that Davenport made its "final decision" regarding acquisition no later than July 22, 1991. On that date, Davenport and Norwest entered into the Agreement and Plan of Reorganization. Our determination on this point is not to be construed as a "bright line rule" for determining when a "final decision" has been made. The facts and circumstances of each case must be evaluated independently to make a proper finding on that issue.

We are simply holding that, in this case, the final decision regarding this acquisition was made on July 22, 1991, and all other "due diligence" and/or "investigatory" expenses incurred after that date, were incurred to facilitate consummation of the acquisition. Accordingly, these expenses, which amount to $27,820, must be capitalized. *See INDOPCO*, 503 U.S. at 89, 90.

## CONCLUSION

After a full and proper review of the record, and based on the foregoing legal analysis, we hold that the Tax Court has misread *INDOPCO* and is hereby

-26-

**REVERSED IN PART**.  The $150,000 of officers' salaries in dispute is fully **DEDUCTIBLE**, as is $83,450 of Davenport's legal/investigatory expenses which were incurred prior to Davenport's "final decision" regarding the acquisition.  The remaining $27,820 of legal/investigatory expenses were incurred after the "final decision" and therefore must be capitalized.  Inasmuch as the Tax Court's conclusion required the capitalization of this $27,820, we **AFFIRM**.[23]

BRIGHT, Circuit Judge, concurring.

I concur in Judge Hand's fine opinion.  I write separately to emphasize that the record in this case is inadequate to show that the portion of the salaries in question, $150,000, was directly or substantially related to the acquisition.  Moreover, the tax court's findings of fact on this issue does not address the direct or indirect relationship of the work of the officers to the acquisition.  That finding recited:

> During 1991, DBTC had 9 executives and 73 other officers (collectively, the officers). John Figge, James Figge, Thomas Figge, and Richard Horst worked on various aspects of the transaction, as did other officers.  None of the offices were hired specifically to render services on the transaction; all were hired to conduct DBTC's day-to-day banking business.  DBTC's participation in the transaction had no effect on the salaries paid to its officers.  Of the salaries paid to the officers in 1991, $150,000 was attributable to services performed in the transaction.  DBTC deducted the salaries, including the $150,000, on its 1991 Federal income tax return.  Respondent disallowed the $150,000 deduction; i.e., the portion attributable to the transaction.

Add. at 11a-12a.

---

[23]To further assist the reader, the Court has provided an Appendix which includes a flow chart illustrating the Court's rationale.

This finding does not address whether some officers at any particular period of time devoted substantial work to the acquisition or whether the officers during the period of time in question only incidentally worked on the acquisition while doing regular banking duties.

In order to determine whether an allocation of officers' salaries to an acquisition-transaction such as made here qualifies as a deduction from income or should be capitalized, the taxing authorities should require the taxpayer to show officers' time devoted to the acquisition as compared to time spent on regular work during a particular and relevant time period.

The finding made by the tax court here does not justify capitalization of the officers' salaries.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

# APPENDIX

To qualify for a deduction, "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *Commissioner v. Lincoln Savings and Loan Ass*oc.*,* 403 U.S. 345 (1971). Assuming the first four requirements are met, the following flow chart will be helpful when determining the proper tax consequence of a business expenditure. By answering the "either or" questions in the flow chart, one can follow the chart to determine whether an expense should be capitalized or deducted. A legend is provided to assist the reader.

## LEGEND

A = physical capital ASSET created or enhanced;

~A = NO physical capital ASSET created or enhanced;

B = BENEFIT beyond the taxable year;

~B = NO Benefit beyond the taxable year;

R = the expense is *directly* RELATED to B;

~R = the expense is *indirectly* related to B;

C = CAPITALIZE;

D = DEDUCT.

